IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JEFFERSON COUNTY COMMISSION;
PATRICIA NOLAND, as an individual
and behalf of all others similarly situated;
and DALE MANUEL, as an individual and
behalf of all others similarly situated,

       Plaintiffs, and

THORNTON COOPER,

       Intervening Plaintiff,

v.                                                                                    Civil Action No. 2:11-CV-989
                                                                                  (KING, BAILEY, BERGER)

NATALIE E. TENNANT, in her capacity as
the Secretary of State; EARL RAY TOMBLIN,
in his capacity as the Chief Executive Officer
of the State of West Virginia; JEFFREY
KESSLER, in his capacity as the Acting
President of the Senate of the West Virginia
Legislature; and RICHARD THOMPSON, in
his capacity as the Speaker of the House of
Delegates of the West Virginia Legislature,

       Defendants.

## PLAINTIFFS JEFFERSON COUNTY COMMISSION, PATRICIA NOLAND, AND DALE MANUEL OPENING BRIEF

      The Jefferson County Commission, Patricia Noland, and Dale Manuel, Plaintiffs, by their Counsel, submit this Opening Brief to this Honorable Court. The Plaintiffs challenge the congressional districting plan approved by the West Virginia Legislature and approved by the Governor. The plan violates both the United States Constitution and the West Virginia Constitution.

1

I. **One Person, One Vote: the standard has not been met with West Virginia's 2011 redistricting.**

The equal population standard for congressional districts, first enunciated by the Supreme Court in *Wesberry v. Sanders*, 376 U.S. 1 (1964) arises from Article I, Section 2, of the Constitution, "Representatives . . . shall be apportioned among the several states . . . according to their respective numbers. . . ." This standard has been strictly interpreted by the Court in *Kirkpatrick v. Preisler*, 394 U.S. 526 (1969), *White v. Weiser*, 412 U.S. 783 (1973), and *Karcher v. Daggett*. 462 U.S. 725 (1983).   In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court held that districting cases are justiciable and expressed confidence that courts would prove able to "fashion relief" where constitutional violations might be found. Development by the Supreme Court of the substantive case law standards that govern state legislative and congressional districting began the following year with *Gray v. Sanders*, 372 U.S. 368 (1963) which included the assertion by Justice Douglas that,

> [t]he conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote."

*Id.* at 381.

**A.  A Brief History of Strict Equality Standard**

In *Wesberry v. Sanders*, the Supreme Court held that the population of congressional districts in the same state must be as nearly equal in population as practicable. 376 U.S. 1 (1964). In 1969, the Supreme Court decided *Kirkpatrick v. Preisler*,  394 U.S. 526 (1969), a case involving congressional districts drawn by the Missouri General Assembly. The 10 districts had an overall range of approximately 6 percent. Writing for a five-member majority, Justice Brennan found that the plan failed to satisfy the "as nearly as practicable" standard of population

2

equality the Court had earlier enunciated in *Wesberry v. Sanders*. The *Kirkpatrick* opinion rejected the suggestion that there is a point at which population differences among districts becomes *de minimis* and held that, insofar as a state fails to achieve mathematical equality among districts, it must either show that the variances are unavoidable or specifically justify the variances. *Id.* at 530-531.  The justifications rejected included a desire to avoid fragmenting either political subdivisions or areas with distinct economic and social interests, considerations of practical politics, and even an asserted preference for geographically compact districts. The majority opinion held that Missouri had failed to show any systematic relationship between its congressional district population disparities and either of two other factors offered as justifications—varying proportions of eligible voters to total population and projected future population shifts among districts. 394 U.S. at 533-536.

In *White v. Weiser*, a 1973 case involving Texas congressional districts, 412 U.S. 783 (1973),  the U.S. Supreme Court ruled that, although the overall range among Texas' 24 congressional districts was smaller than that invalidated in *Kirkpatrick v. Preisler* in 1969, the Texas districts were not as mathematically equal as reasonably possible and were therefore unacceptable. The Court specifically rejected an argument that the variances resulted from the Texas Legislature's attempt to avoid fragmenting political subdivisions.

**B.  The *Karcher* decision.**

In *Karcher v. Daggett*,  462 U.S. 725 (1983) the U.S. Supreme Court reaffirmed its position in *Kirkpatrick v. Preisler* that there is no level of population inequality among congressional districts that is too small to worry about, as long as those challenging the plan can show that the inequality could have been avoided. As Justice Brennan wrote for the majority: "We thus reaffirm that there are no *de minimis* population variations, which could practicably be

3

avoided, but which nonetheless meet the standard of Art. I, Sec. 2, without justification." Id. at 734. New Jersey Legislature's plan at issue in *Karcher* an overall range of 3,674 people, or .6984 percent. *Id*. at 728. The plaintiffs showed that at least one other plan before the Legislature had a "maximum population difference" (overall range) of only 2,375 people or .4514 percent, thus carrying their burden of proving that the population differences could have been reduced or eliminated by a good-faith effort to draw districts of equal population. *Id.* at 728-729. The Court also noted that the population differences could have been reduced by the simple device of transferring entire political subdivisions of known population between contiguous districts. *Id*. at 739.

  Once the plaintiffs had shown that the population differences could have been reduced, the state had the burden of proving that each significant variation from the ideal was necessary to achieve "some legitimate state objective." *Id.* at 740. Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, or avoiding contests between incumbent Representatives. However, *a State must show with some specificity that a particular objective required the specific deviations in its plan, rather than simply relying on general assertions*. *Id*. The showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely.

By necessity, whether deviations are justified requires case-by-case attention to these factors.

462 U.S. at 740-741.[1]

---

[1] Lower courts have relied on the holding and tests under *Karcher* to determine if congressional district plans achieve population equality. *See State ex rel. Stephan v. Graves*, 796 F. Supp. 468 (D. Kan. 1992) (ruling that a congressional district plan with a "maximum population deviation" (overall range) of .94 percent was unconstitutional regardless of the fact that the plan maintained whole counties in each congressional district; the court instead adopted a plan with an overall range of 0.01 percent, which was one of three plans before the court with "population deviations" (overall ranges) of less than .34 percent). *See also Larios v. Cox*, 300 F. Supp. 2d 1320, 1354-55 (N.D. Ga. 2004) (ruling that a congressional plan with a total deviation of 72 people was constitutional due to a legitimate state interest in avoiding precinct splits along something other than easily recognizable boundaries despite testimony that an alternate plan that addressed traditional districting principles with less deviation was possible), aff'd 542 U.S. 947 (2004) (mem.) (Stevens & Breyer, JJ. concurring) (Scalia, J., dissenting); *Graham v. Thornburgh*, No. 02-4087-JAR, 207 F. Supp. 2d 1280 (D. Kan. 2002) (ruling that a congressional plan with a maximum deviation of 33 people was constitutional despite existence of alternative plans with lower deviations due to the adopted plan's relatively small deviation, the fact that the deviation was a result of balancing legitimate state goals, and the adopted plan caused the least shift of population from the 1992 plan); *Vieth v. Pennsylvania*, No. 1:CV-01-2439, 195 F. Supp. 2d 672 (M.D. Pa. 2002) (ruling that a congressional plan with an overall range of 19 people was unconstitutional based on the finding that the justification offered by the state (avoiding split precincts) could be more closely achieved by alternative plans with minimum possible population deviations and that the justification was not the actual cause of deviation), appeal dismissed as moot sub nom. *Schweiker v. Vieth*, 537 U.S. 801 (2002) (mem.); *DeWitt v. Wilson*, 856 F. Supp. 1409 (E.D. Calif. 1994) (finding a plan with an overall range of .49 percent, see *Wilson v. Eu*, 823 P.2d 545, 607-09 (Cal. 1990), was justified by legitimate state objectives), aff'd in part, appeal dismissed in part, 515 U.S. 1170 (1995) (mem.); *Stone v. Hechler*, 782 F. Supp. 1116 (W.D. W.Va. 1992) (holding that a congressional plan with an overall range of .09 percent was constitutional even though 17 other plans had lower overall ranges, the court found that the deviation was necessary to further legitimate state goals of preserving the cores of prior districts and making districts compact and that the adopted plan was more successful in achieving those goals than were the other plans); *Anne Arundel County Republican Cent. Comm. v. State Advisory Bd. of Election Laws*, 781 F. Supp. 394 (D. Md. 1991) (ruling that a congressional plan with a "variance" (overall range) of 10 people was constitutional based on the state's justifications that the plan kept major regions intact, created a minority voting district, and recognized incumbent representation with its attendant seniority in the House), aff'd 504 U.S. 938 (1992) (mem.), reh'g denied 505 U.S. 1231 (1992); and *Turner v. Arkansas*, 784 F. Supp. 585 (E.D. Ark. 1991) (accepting a plan with a "variance" of 0.78 percent even though several plans with lower "variances" were introduced; the court found that the plan achieved a legitimate state objective because none of the other plans met the dual objectives of population equality plus meeting other constitutional criteria), aff'd 504 U.S. 952 (1992) (mem.). Cf. *Hastert v. State Bd. of Elections*, 777 F. Supp. 634 (N.D. Ill. 1991) (adopting a congressional plan with an overall range of one person, not only on the basis that the "deviation" was smaller

In 1997, *Abrams v. Johnson*, 521 U.S. 74 (1997), the Supreme Court affirmed the principle established in *Karcher* that "absolute population equality [is] the paramount objective" in congressional plans and … that "[w]ith a court plan, any deviation from approximate population equality must be supported by enunciation of historically significant state policy or unique features." 521 U.S. 74, 98 (citing *Chapman*, 420 U.S. at 26 and *Connor*, 431 U.S. at 419 - 420).

**C.  The 2011 West Virginia plan violates the one person, one vote requirement.**

It should be without question that the enacted bill in West Virginia violates *Karcher*. Plaintiffs alleged in their complaint at paragraph 23, and all Defendants admitted that "As enacted, the final bill provided for three congressional districts as follows: First Congressional District – 615,991; Second Congressional District – 620,862; and, Third Congressional District – 616,141." Additionally, all parties agree with the portion of paragraph 27, that the enacted bill creates a variance of 0.79% (Relative Overall Range) – a difference of 4,871 people.

The complaint alleges "The 0.79% variance was the second highest population variance of the four amendments proposed …" No party denied this. In other words, on the pleadings, there is no question that there were alternate redistricting plans that would have reduced or eliminated the population variances.

*Karcher's* two steps are well-established: first, plaintiffs must show that "the population differences among districts could have been reduced or eliminated altogether by a good-faith

---

than the other plan offered (17 people) but also because the adopted plan better met other constitutional criteria such as fairness to minorities and fair distribution of party seats across party lines; even though the court recognized that cases such as *Karcher* consider even minute deviations legally significant, it stated that "rather than reduce congressional redistricting to a 'hair splitting game' we shall focus greater attention on other constitutional criteria that may reveal" a distinction between the two plans more significant than the mathematical distinction. Id. at 645 (citing *Carstens v. Lamm*, 543 F. Supp. 68, 85 (D. Colo. 1982)).

[2] The total perimeter test measures the total length of district boundaries across an entire

6

effort to draw districts of equal population," and if plaintiffs do so, defendants must "prov[e] that each significant variance between districts was necessary to achieve some legitimate goal." *Karcher*, 462 U.S. at 730-31. As *Karcher* makes clear, there is no such thing as a population variation that is too small to be of constitutional significance in the context of congressional redistricting - Defendants must justify any and every deviation once plaintiffs have met their burden. *Karcher*, 462 U.S. at 734 ("there are no *de minimis* population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I, Sect. 2, without justification.").

Here, the variance is greater than in *Karcher*. Accordingly, the burden immediately shifts to the Defendants to defend the plan.

**II. West Virginia Constitution's compactness requirement has not been met.**

The Constitution of West Virginia, Art. I, §4 requires that,

> [f]or the election of representatives to Congress, the State shall be divided into districts, corresponding in number with the representatives to which it may be entitled; which districts shall be formed of contiguous counties, and be compact. Each district shall contain as nearly as may be, an equal number of population to be determined according to the rule prescribed in the Constitution.

Thus, the West Virginia Constitution mandates that districts shall be "compact." The West Virginia Constitution does not define compactness, and courts have struggled with how to handle the concept. Although population, with the aid of computing technology, can now be determined with mathematical certainty, compactness has been considered a relative term. *See Stone v. Hechler*, 782 F.Supp. 1116, 1122 (N.D. W.Va. 1992). Indeed, one indication that courts have had difficulty in dealing with compactness is found on the West Virginia State Senate's website on redistricting, where there is a link to a Power Point presentation titled, "Compactness: The Eye of the Beholder," prepared by Kimball Brace of Election Data Services, Inc. *See* http://www.legis.state.wv.us/senate1/redistricting/redistricting_documents/2010/Compactness.pdf. This

presentation readily acknowledges that compactness is not well understood and that courts – among others – have difficulty applying it during redistricting.

Indeed, in *Stone v. Hechler*, a challenge to congressional redistricting in West Virginia, the court itself essentially acknowledged the difficulty it had in determining compactness as a state constitutional concept when it stated,

> The West Virginia Constitution does not define compactness but imposes upon the State Legislature the obligation to consider it as a principal factor in apportioning congressional districts. The Legislature was aware both of the state constitutional requirement and the effect of compactness in the federal constitutional equation. We think it has been adequately demonstrated that each legislative body kept the concept of compactness as a principal goal of its redistricting efforts and did this primarily in pursuit of fulfilling its State constitutional obligations. The fact that there were other Plans that would be deemd more compact than Plan II under the three tests employed by the experts does not detract from the Legislature's effort. In the legislative view, the districts in Plan II were compact *as the Legislature viewed that requirement under the West Virginia Constitution*, and in weighing that and other legitimate legislative goals it was acting preeminently in a role reserved to a state legislature by the United States Supreme Court.

*Stone*, 782 F.Supp. at 1127-28 (emphasis added). In other words, the court in *Stone* agreed that compactness is in the eye of the beholder, and the court deferred to the Legislature as the beholder of compactness.

Although compactness is a requirement under West Virginia's Constitution, it has a different role under federal caselaw. Instead of being a requirement, compactness can be an acceptable rationale for *deviating* from the ideal population. See *Karcher v. Dargett*, 462 U.S. 725, 740 (1983) ("Any number of consistently applied legislative priorities might justify some variance, including, for instance, making districts compact….").

There are two ways to determine compactness. The first is quantitative. In the *Stone v. Hechler* case, the experts propounded by both sides discussed three types of quantitative tests: the

8

total perimeter test, the *Reock* test, and the *Schwartzberg* test.[2] *Id.* These tests were among those cited by Justice Stevens's concurring opinon in the U.S. Supreme Court decision of *Karcher v. Daggett*, 462 U.S. 725, 750-58, 103 S.Ct. 2653, 2672-74 (1983). In addition, Justice Stevens points to numerous other mathematical methods for determining compactness. *Karcher*, n. 19, at 756. Without question, more quantitative ways to determine compactness have likely been developed in the nearly thirty years since the *Karcher* decision.

The second way to determine compactness is to conduct a qualitative assessment. The preference for a qualitative assessment of compactness over a strictly mathematical assessment is based upon the West Virginia Constitution, which was adopted in 1872.

In interpreting the text of the Constitution, we are guided by the principle that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *See Dist. of Columbia v. Heller*, 554 U.S. 570, 576, 128 S. Ct. 2783, 2788, 171 L. Ed. 2d 637 (2008) (*citing United States v. Sprague*, 282 U.S. 716, 731, 51 S.Ct. 220, 75 L.Ed. 640 (1931)).

Thus, the quantitative, technical meanings of "compact" as encapsulated in the *Reock*, *Schwartzenberg*, and perimeter tests could not be what were intended by the drafters of the West Virginia Constitution, who were without the advanced cartographic and computing tools of today.

---

[2] The total perimeter test measures the total length of district boundaries across an entire congressional districting plan. *Stone*, 782 F.Supp at 1127, n12. The lower the total perimeter, the more compact the plan. *Id.* The *Reock* test locates the two points on each district's perimeter that are furthest apart and thus uses the distance between the points as a diameter to construct the smallest circle completely encompassing the district. *Id.* The ratio of the district's area to the area of the circle is then computed, resulting in a number between 0.00. and 1.00. *Id.* The nearer the ratio is to 1.00, the more compact the district. *Id.* The Schwartzberg test calculates the adjusted perimeter by connecting straight lines those points on a district boundary where three or more census units from any district meet. *Id.* The area of the district is used as the area of a circle whose perimeter is then calculated. *Id.* The length of the adjusted perimeter is divided by the perimeter of the circle to arrive at a resulting value between 1.00 and infinity. *Id.* The closer the resulting value is to 1.00, the more compact the district is deemed to be. *Id.*

Instead, qualitative assessments of compactness must be based on what are known as "communities of interest." This type of qualitative assessment was recognized by Justice Stevens in his concurring opinion in *Karcher*, when he points out that geographic compactness may differ from sociopolitical compactness and quotes a geographer: "In many regions, the population is uneven, perhaps strung out along roads or railroads. Travel may be easier and cheaper in some directions than in others, such than an elongated district astride a major transport corridor might in fact be the most compact in the sense of minimum travel time for a representative to travel around the district. If so, then a modified criterion, the ratio of the maximum to the minimum travel time, would be a preferred measure."[3] *Karcher*, n. 20. (citing R. Morrill, *Political Redistricting and Geographic Theory*, n. 19, at 22).

Justice Stevens' concurring opinion espoused the qualitative assessment of compactness because compactness serves "independent values; it facilitates political organization, electoral campaigning, and constitutional representation." 462 U.S. 725, 756 (concurring). In other words, compactness aligns communities of interest.

There is scant evidence, qualitative or quantitative, that the current second district is compact. It is 313 miles from Charles Town, the county seat of Jefferson County to Ripley, the county seat of Jackson County—also in the Second District. By contrast, Charles Town is closer to New York City (267 miles), the state capital of New Jersey, Trenton (207 miles), the state

---

[3] Interestingly, if this type of assessment of compactness referenced by Justice Stevens had been used to form the 2nd Congressional District, the District could not look the way it does. Although perhaps theoretically possible to travel from Jefferson County to Jackson or Putnam Counties by land without departing the District, such a trip normally requires travel into either the 1st or 3rd Congressional Districts, after traveling through either Maryland via Interstates 70 and 68 or Virginia via Interstates 81 and 64. Morrill's qualitative assessment would thus work strongly against the current makeup of the 2nd Congressional District because "sociopolitical" compactness is simply non-existent.

capital of Pennsylvania, Harrisburg (112 miles ), the state capital of Delaware, Dover (152 miles), the state capital of Maryland, Annapolis (95 miles), the state capital of Virginia (148 miles) and Washington, DC, the nation's capital (66 miles) than it is to the other end of the second district.[4] Ripley is closer to Indianapolis, Indiana than it is to Charles Town.   From Charles Town to Marlinton, Pocahontas County—which is in the 3rd District, it is 190 miles, while it is only 89 miles to Keyser, Mineral County, which is in the 1st District.

JEFFERSON COUNTY COMMISSION
PATRICIA NOLAND and
DALE MANUEL
By Counsel

/s/ Stephen G. Skinner
Stephen G. Skinner (W.Va. Bar # 6725)
Andrew C. Skinner (W. Va. Bar # 9314)
SKINNER LAW FIRM
P. O. Box 487
Charles Town, West Virginia 25414
(304) 725-7029/Fax: (304) 725-4082
sskinner@skinnerfirm.com


/s/David M. Hammer
David M. Hammer (W.Va. Bar # 5047)
HAMMER, FERRETTI & SCHIAVONI
408 West King Street
Martinsburg, WV 25401
(304) 264-8505/Fax: (304) 264-8506
dhammer@hfslawyers.com

---

[4] See www.maps.google.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JEFFERSON COUNTY COMMISSION;
PATRICIA NOLAND, as an individual
and behalf of all others similarly situated;
and DALE MANUEL, as an individual and
behalf of all others similarly situated,

       Plaintiffs, and

THORNTON COOPER,

       Intervening Plaintiff,

v.                                      Civil Action No. 2:11-CV-989
                                           (KING, BAILEY, BERGER)

NATALIE E. TENNANT, in her capacity as
the Secretary of State; EARL RAY TOMBLIN,
in his capacity as the Chief Executive Officer
of the State of West Virginia; JEFFREY
KESSLER, in his capacity as the Acting
President of the Senate of the West Virginia
Legislature; and RICHARD THOMPSON, in
his capacity as the Speaker of the House of
Delegates of the West Virginia Legislature,

       Defendants.

## CERTIFICATE OF SERVICE

       I hereby certify that on the 20th day of December, 2011, I electronically filed the foregoing

Plaintiffs Jefferson County Commission, Patricia Noland, and Dale Manuel Opening Brief with the Clerk

of the Court using the CM/ECF system which will provide notice to counsel of record as follows:

David M. Hammer, Esquire
Hammer, Ferretti & Schiavoni
408 W. King Street
Martinsburg, WV 25401

Thornton Cooper, Esquire, pro se
3015 Ridgeview Drive
South Charleston, WV 25303

Thomas Rodd, Esquire
West Virginia Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301
Counsel for the Secretary of State and the Governor

George E. Carenbauer, Esquire
Adam B. Tomlinson, Esquire
Steptoe & Johnson PLLC
707 Virginia Street, East, Eighth Floor
P.O. Box 1588
Charleston, WV 25326-1588
Counsel for President Kessler

Anthony Majestro, Esquire
Cynthia Majestro, Esquire
Powell & Majestro, PLLC
405 Capitol Street, Suite P1200
Charleston, WV 25301
Attorneys for Speaker Thompson


/s/ Stephen G. Skinner