IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA
At Charleston

**JEFFERSON COUNTY COMMISSION, et. al.**
        **Plaintiffs,**

and

**THORNTON COOPER,**
        **Intervening Plaintiff,**

v.                                           Civil Action No. 2:11-CV-00989
                                             (Honorable King, Bailey, Berger)

**NATALIE TENNANT,** *in her capacity as*
*The Secretary of State,* **et al.,**
        **Defendants.**

### JOINT OPENING BRIEF OF DEFENDANTS
### JEFFREY KESSLER AND RICHARD THOMPSON

**I.      INTRODUCTION**

On August 5, 2011, the West Virginia Legislature enacted Enrolled S.B. 1008 to

redistrict the state's three Congressional Districts for the elections in 2012 following the results

of the 2010 census in accordance with the requirements of the United States Constitution and the

West Virginia Constitution.

In enacting the bill, the Legislature followed several historic principles that have been

consistently followed in the past half century.  S.B. 1008 maintains the integrity of counties,

avoids contests between incumbent Representatives, preserves the core of prior districts, protects

communities of interest, establishes districts composed of contiguous counties and are compact,

and achieves these objectives with as little change as possible.  Further, the bill was enacted in

good faith and with total disregard to partisan political considerations.

1

The bill contains a population variance of .79 percent among the three districts, which is nearly identical to the .78 percent variance in the case of *West Virginia Civil Liberties Union v. Rockefeller*, 336 F.Supp. 395 (S.D. W.Va. 1972) where the three judge District Court upheld West Virginia's 1971 congressional redistricting bill as constitutional. The *Rockefeller* case was cited by the United States Supreme Court in the case of *Karcher v. Daggett* as an example of where a "minor variance" in population is legitimate in the pursuit of certain policy objectives. 462 U.S. 725 at 740-41, 103 S.Ct. 2653 at 2663 (1983).

The bill also creates districts that are "compact" as required by Article 1, Section 4 of the West Virginia Constitution. In particular, the Second Congressional District that is challenged by Plaintiffs as violative of this provision, is compact in that it is similar to the District as constructed in 1991, which was upheld in *Stone v. Hechler*, 782 F. Supp. 1116 (N.D. W.Va.1992). The difference between the Second Congressional District under the 1991 plan and that in S.B. 1008 is that the District has been reduced in size by removing three counties, making it even more compact than the District as approved by the court in the *Stone* case.

Because the Legislature adopted a redistricting plan that has already been found compact, because the population variance is a mere one one-hundredth of a percent higher than the variance expressly approved by this Court and implicitly approved by the United States Supreme Court, and most importantly, because the variance from numerical equivalency is justified by the Legislature's expressed desire to achieve legitimate policy objectives, the Court should uphold the constitutionality of S.B. 1008.

## II.    RELEVANT FACTS

### A.    MODERN HISTORY OF CONGRESSIONAL REDISTRICING IN WEST VIRGINIA

2

Since the decision by the United States Supreme Court in *Wesberry v. Sanders*, 376 U.S., 1 (1964), applying the principle of one person one vote in the congressional reapportionment context, the West Virginia Legislature has been consistent in applying basic policy objectives while complying with the "one man one vote" mandate. As previously stated, these policies are to maintain the integrity of counties, to comply with the state Constitution's requirement for compactness, to avoid contests between incumbents, to preserve the core of prior districts, to make as little change as possible, and to act in good faith without political partisan considerations.

The first redistricting after *Wesberry* was done by the Legislature in 1971 following the 1970 census. H.B. 929 contained a population variance of .78 percent, which was upheld by a 3-judge Federal panel in *Rockefeller*. (Acts of the Legislature 1971, c.16, attached as Ex. A) The court placed particular emphasis on the fact that the legislation was "remarkably free of partisan politics" having been adopted with genuine bipartisan support. It also determined that the districts were compact under the state Constitution, including the Second Congressional District which at the time consisted of 20 counties, covering an area of 9,822 square miles, 40 percent of the state's territory, even though it was one of four Districts. (See Square Mileage of West Virginia Counties, attached Ex. B)

The second Congressional redistricting in the modern era was accomplished in 1982 following the 1980 census. H.B. 1160 simply moved two of the State's 55 counties among the four Congressional districts. (Acts of the Legislature 1982, c. 32, attached as Ex. C) As in the past, it maintained the integrity of counties; continued compactness by reducing the Second Congressional District by one county; avoided contests among the incumbents; and preserved the core of the Districts by making as little change as possible.

The third Congressional redistricting after the "one man one vote" decisions of the 1960's took place in 1991 following the 1990 census. At that time, the Legislature was confronted with the need to reduce the number of districts from four to three. Despite this difficult assignment, it enacted a plan that created only one contest among the incumbents, and also maintained the integrity of counties. H.B. 221 created the basic structure of districts that has been in place for the past 20 years, including the Second Congressional District that has stretched from Jefferson to Mason counties. (Acts of the Legislature 1991, 2nd Ex. Sess. c. 14, attached as Ex. D) Under the bill, the Second District consisted of 20 counties, comprising 9,501 square miles, equal to 39.23 percent of the state's territory. (See Square Mileage of West Virginia Counties, Ex. B) The bill was challenged in Federal court where a three judge District Court determined that it complied with the compactness requirement of the West Virginia Constitution. *Stone v. Hechler*, 782 F. Supp. 1116 (N.D.W.Va.1992)

The fourth time the Legislature engaged in redistricting in the modern era was in 2001 following the 2000 census. H.B. 510 simply moved Gilmer County from the Second to the First, and Nicholas County from the Second to the Third, which together comprised 994 square miles. (Acts of the Legislature 2001, 2nd Ex. Sess., c.9, attached as Ex. E) In so doing, the Second Congressional District, which had already been found by the court in 1991 to be compact, was reduced to 18 counties, comprising 8,513 square miles, equal to 35.13 percent of the state's territory. (See Square Mileage of West Virginia Counties, Ex. B) According to the Almanac of American Politics, former state Senator James Humphreys who had lost the election to the Second Congressional District in 2000 to Republican Shelley Moore Capito had proposed a bill that would increase the Democratic advantage in the District for the 2002 election, but the Legislature rejected the proposal in favor of the simpler alternative that preserved the core of the

4

existing district and made as little change as possible.  (See West Virginia Congressional

District, www3.nationaljournal.com/pubs/almanac/2008/states/wv/wv_cong.htm, attached as Ex.

F)

Finally, in 2011, the Legislature enacted S.B. 1008 which is at issue in this case.  In

keeping with the Legislature's longstanding practice of making as little change as possible, the

bill simply moves Mason County from the Second Congressional District to the Third.  It has a

population variance of .79 percent, which is virtually identical to the .78 percent variance

approved by the 3-judge Federal panel in the *Rockefeller* case, which was implicitly upheld by

the U.S. Supreme Court in *Karcher*.  With respect to compactness, the bill further reduces the

size of the Second Congressional District, so that it will now consist of 17 counties, comprising

8,068 square miles, equal to 33.29 percent of the state's territory - almost precisely one third of

West Virginia's 24,231 square miles.  (See Square Mileage of West Virginia Counties, Ex. B)

By removing Mason County, S.B 1008 also shortens the distance from the eastern edge of the

District in Jefferson County to the western edge, which will now be in Putnam County instead of

Mason.

The bill was passed with overwhelming bipartisan support, with only 1 vote against the

bill in the Senate and only 5 votes in the House.  Despite a 28 to 6 majority in the Senate, and a

65 to 35 majority in the House of Delegates, the Legislature enacted a bill that largely keeps in

place a Congressional districting plan where Republicans hold 2 of the 3 seats.  As discussed

herein, the Legislature specifically rejected proposals offered at the request of the Democratic

Congressional Campaign Committee, and took no action to benefit its own current or former

members who have demonstrated interest in running for the seats.  Once again, the Legislature

demonstrated that its priorities in Congressional redistricting are maintaining the integrity of

counties; complying with compactness; avoiding contests among incumbent Representatives; preserving the core of prior districts; and accomplishing all of these with as little change as possible without regard to partisan politics.

## B.   CONGRESSIONAL REDISTRICTING WAS DONE IN GOOD FAITH AND WAS APOLITICAL

In the 1972 case of *West Virginia Civil Liberties Union v. Rockefeller*, the Court commended the Legislature for having enacted a redistricting plan that was "remarkably free of partisan politics." 336 F. Supp. 395, 399 (S.D. W. Va. 1972). The Court noted that the plan had been adopted with genuine bipartisan support, and was done in good faith. (Id.)

The same is true, perhaps to an even greater extent, with respect to the enactment of S.B. 1008 in 2011. Despite the fact that the majority of members in both the Senate and House of Delegates, as well as the Governor, are Democrats, the Legislature adopted a plan that makes as little change as possible to the current districts in which two of the three incumbents are Republicans. The Democrats command a super majority of 28-6 in the state Senate, or 82 percent, and a similar majority of 65 to 35 in the 100 member House of Delegates.

The Charleston Gazette reported that the Democratic Congressional Campaign Committee (DCCC) favored two redistricting plans to the Legislature this year that were designed to increase the likelihood of the election of Democrats to Congress. (See "New Redistricting Plan Would Switch Mason County" CHARLESTON GAZETTE, Aug. 4. 2011, attached as Ex. G) At the request of the DCCC, Senator Roman Prezioso offered the plans as amendments to the bill under consideration by the Senate Redistricting Committee on August 4, 2011, and both were rejected by the Committee.

Further, the Legislature maintained the existing structure to the fullest extent possible, even though three current or former state Senators have either run unsuccessfully for Congress,

or have a committee in place to do so in the future, and could likely benefit from a redistricting that would increase their odds of success.

Former Democratic state Senator Michael Oliverio suffered an extremely narrow loss to Republican David McKinley in the First Congressional District just last year, where the margin was 50.4 percent to 49.6 percent -- only 1,440 votes. (See Election Results, attached as Ex. H) Of the 28 Democrats currently in the state Senate, 23 were colleagues of Senator Oliverio until his term expired at the end of last year. (See Senate Membership, attached as Ex. I)   A plan offered on the Senate Floor as an alternative to S.B. 1008 that would have resulted in a net increase of 4,663 in the number of registered Democrats in the First District was defeated 14 to 17.  (See Voters Registration Information, attached as Ex. J)(See also Discussion of Snyder Amendment, infra, at 17-18)

Current Democratic state Senator Erik Wells  ran unsuccessfully as his party's nominee against incumbent Republican Shelley Moore Capito in 2004, but nonetheless carried the District's (and state's) largest county, Kanawha County, which itself constitutes approximately one-third of the District's population. (See Ex. K)

Current Democratic state Senator John Unger, who serves as Majority (i.e., Democratic) Leader and chairs the Redistricting Committee, filed pre-candidacy papers in 2007 to run for the Second Congressional District in 2008, but decided shortly before the formal filing period in January of 2008 not to run that year.   He continues to maintain a Committee with the Federal Elections Commission with a current balance of almost $48,000 that could be used for a future race.  (See Federal Election Commission Report, attached as Ex. L)

The action of the Legislature in enacting S.B. 1008 is similar to that taken in 2001. Former Democratic state Senator James Humphreys narrowly lost to Republican Shelley Moore

Capito in 2000, and presented a plan to the Legislature in 2001 that would have moved three Republican-oriented counties from the District and would have added 3 Democratic-oriented counties, in order to increase the odds for a Democratic victory in the 2002 election. (See, Almanac, attached as Ex. F)  Despite the obvious advantage to the party, the Democratic majority in both Houses of the Legislature rejected the proposal in 2001, and instead chose to make the minimal change by moving only 2 counties without regard to partisan politics.

It is clear that, despite containing an unusually strong majority of Democrats, the Legislature chose its longstanding principle of stability of districts over partisan advantage and even over personal advantage to colleagues and friends.  All but one of the participating Senators ultimately voted for the plan that essentially preserves the three districts of which two of three are held by Republicans.  (See Senate Journal, attached as Ex. M, at 52-53)[1]  In the House of Delegates, the vote was 90 in favor to 5 against, with 5 absent.  (See House Roll Call Vote, attached as Ex. N)   The only votes against the bill were by 3 delegates from the Eastern Panhandle, and 2 delegates representing Mason County.  In both Houses, the votes were made in complete good faith and were overwhelmingly bipartisan.  Even the 5 negative votes in the House of Delegates were bipartisan expressions, with 3 from Democrats and 2 from Republicans. Finally, Democratic Senate President Earl Ray Tomblin, acting as Governor, approved the bill.

**C.**   **THE LEGISLATURE'S ENACTMENT OF S.B. 1008 WAS THOROUGH AND WELL REASONED**

Congressional redistricting is an ongoing process, for which the Legislature was well-prepared even before the figures from the 2010 census were made available in April 2011.  Many

---

[1] Throughout the Brief, a number of documents from the Senate record are cited.  Attached as Exhibit AA please find a certification from the Clerk of the Senate documenting the authenticity of these records from the Senate.

members of the Legislature, and most members of the leadership of both Houses, had
participated in the redistricting ten years earlier, at which time the Legislature adjusted the state's
three Congressional districts by simply moving two counties from the Second Congressional
District. The Legislature took steps to insure that its members were well informed as to the facts
and the law in Congressional redistricting in order to achieve compliance with Constitutional
requirements as well as its policy objectives. These steps included:

- The establishment and maintenance since 1991 of a full-time professionally staffed
  Redistricting Office under the jurisdiction of the Legislature's Joint Committee on
  Government and Finance, a statutory body consisting of the leadership of both the Senate
  and House and Delegates.

- The availability to members of the Legislature, of assistance by professional staff in the
  Redistricting Office in devising proposed Congressional districts. These services include
  the drawing of maps; the determination of population variances; and the results of the
  major formulae used in determining "compactness".

- The establishment by the Senate of a Redistricting Task Force in March of 2011,
  consisting of 17 Senators – one half the membership – which held 12 open meetings
  throughout the state, at which the public was invited to speak.

- The establishment by each of the Houses of websites in the Spring of 2011, explaining
  the redistricting process, and inviting public comment.[2]

- The establishment by the House of a Redistricting Committee, which held two meetings
  prior to the extraordinary session, at which it heard from national and state experts on the
  elements of redistricting.

- The sending of several members of the Legislature's professional staff to seminars on
  legal and other issues relating to redistricting, conducted by the National Conference of
  State Legislatures.

---

[2] *See* http://www.legis.state.wv.us/senate1/redistricting.cfm and http://www.legis.state.wv.us/house/redistricting.cfm

By taking these steps, the Legislature ensured that it was well informed as an institution about the constitutional requirements of reapportioning congressional districts.

## D. THE LEGISLATURE CLEARLY EXPRESSED ITS LEGITIMATE POLICY OBJECTIVES

The Senate Redistricting Committee held a meeting on August 4, 2011 during which Professor Bob Bastress of the West Virginia University College of Law offered testimony explaining the Federal and state constitutional standards for congressional redistricting. Professor Bastress informed the Legislature that "the overriding principle . . . with congressional redistricting is the requirement to achieve perfect equality; that is, a perfect one person, one vote districts. [sic] Variations from that are permitted if they're minor variations and if they are necessary to achieve some legitimate state interest. And the court has been quite rigid in insisting that the Legislature make every good faith effort to achieve perfect equality." (Senate Redistricting Comm., 8/4/11, attached as Ex. O at 8.)

The Legislature was informed that any variation from perfect numerical equality had to be justified. Professor Bastress explained that traditional redistricting criteria which could justify a deviation from numerical equality include following traditional communities of interest, preserving preexisting districts, avoiding contests between incumbents, and complying with the State Constitutional requirement of compactness. (Id. at 9) Armed with this knowledge, State Senators explained their legitimate interest in varying slightly from numerical equality.

Professor Bastress was asked about the 1991 challenge to the State's congressional districts in *Stone v. Hechler*, 782 F.Supp. 1116 (N.D. W. Va. 1992). Bastress explained that in 1991, the redistricting plan adopted by the Legislature was not the most equal, that the State had to justify its deviation, and that the Court found that the State carried its burden.

Senator Corey Palumbo asked whether the constitutional requirements with respect to

redistricting had changed since 1991, and Bastress explained they had not. (Senate Redistricting

Comm., 8/4/11 at 11-12) ("Q:  And the requirements for the congressional districts have been

essentially the same over the course of the last 20 years.  Have they changed at all?  A:  No, that

was adopted in 1991, challenged in 1991 and not challenged in 2001.  Q:  But I mean the

requirements that we're bound to follow in drafting these districts - - those haven't changed,

have they?  A:  Those have not changed.  You're right.  That's correct.")

        The questioning by Senator Palumbo evidences intent to follow closely the same

justifications that the Legislature gave in 1991 for deviating from numerical equivalency:

compactness, preserving the core of existing districts, keeping communities of interest intact, and

avoiding contests between incumbents.  Senators knew that the Federal court in *Stone* upheld the

constitutionality of the 1991 plan and that the Federal constitutional requirements for

redistricting had not been altered by the Federal courts in the intervening 20 years.

In supporting a redistricting plan that closely mirrors the 1991 plan, Legislators could not have

done any more to preserve the core of existing districts.  Additionally, they took a plan that was

held to be compact in *Stone* and made it more compact by removing Mason County, the

westernmost county in the prior Second Congressional District.

        Senators understood that in support of efforts to preserve the core of existing

congressional districts, West Virginia has typically made as small a change as possible to

existing congressional districts – particularly in those years when the state has retained the same

number of seats in the House of Representatives. (Senate Redistricting Comm., 8/4/11 at

47)(Senator Clark Barnes) ("I also would like to point out that historically West Virginia as we

have looked at our maps every ten years - - unless we had to add a district or remove a district - -

historically we have not changed our districts substantially.")   In further support for keeping West Virginia's pre-existing congressional maps Senator Barnes noted that he had recently visited 53 of the State's 55 counties during his campaign for the Republican nomination for Governor.   Barnes stated that "[n]owhere did I hear anyone complain about their representation, no matter who it was, or complain about the district, the way it was laid out.  There were no complaints." (Id. at 48)

The Senate considered the possibility of keeping the existing districts intact while at the same time achieving numerical equivalency by carving the precise number of people out of the Second Congressional District and putting them into the First and Third Congressional Districts. Senator Palumbo asked Professor Bastress whether the plan adopted by the Legislature would be more defensible if the requisite number of people were moved "from the northern part of Wirt County" to the First District and from the "southern part of Randolph County" to the Third District. (Id. at 53)  Professor Bastress explained that achieving numerical equivalence in that way would insulate the plan from a Federal constitutional challenge.

The Legislature chose not to amend the plan in the manner discussed by Senator Palumbo's hypothetical because of the State's long history of keeping counties intact during congressional redistricting.   Senator Mike Hall, in discussing the Supreme Court's *Karcher* opinion with Professor Bastress noted that protecting the integrity of West Virginia's counties was a justification for the plan adopted by the Legislature.  (Id. at 52) ("But in this case county lines are what they are and I think that would be a justifiable argument to keep it that way.")

In passing the bill, the Legislature also made clear its intent to keep together communities of interest.  Senator Barnes, in supporting the ultimately adopted plan in the Redistricting Committee said:

12

> You know, not only are we keeping the core of a district together;
> but we're keeping the core of three districts together.  And I think
> that's very important; because you know, when you look at the
> southern [third] district, primarily we certainly have a coalfields
> district.  In the northern part, I can tell you that the areas around
> Keyser, the areas around Marshall County and all, there's a lot of
> commonality between those two areas even though they're on
> different sides of the state
>
> .
> When we look at the second district, the commonality is striking.
> Number one, we have the two largest counties, populations, in the
> state in Kanawha County and Berkeley County.  And with large
> populations you face similar challenges - - similar challenges in
> law enforcement, similar challenges in growth, similar challenges
> with your cities within the area."

Id. at 56.

Senator Barnes went on to note that two areas on opposite ends of the Second District:

the Eastern Panhandle and Putnam County, were two of the fastest growing areas of West

Virginia.  (Id. at 57)  These remarks demonstrate that the Senate considered communities of

interest within the State and valued keeping them intact within a single congressional district.

The Senate recognized that, with respect to issues confronted by urban areas, the Eastern

Panhandle shared common challenges with Charleston and Kanawha County.  The Senate

recognized that Jefferson and Berkeley Counties share the challenge of growth with Putnam

County.

When the debate moved to the floor of the Senate, Senators continued to express their

interest in preserving communities of interest within congressional districts and protecting the

core of existing districts.  Senator Brooks McCabe argued that while the plan ultimately adopted

moved only residents of Mason County from one congressional district to another, the plan

offered by Senator Snyder would have forced tens of thousands of additional residents to move

from one district to another.  (See Remarks of Senator Brooks F. McCabe, Jr., Reapportioning

congressional districts, 8/5/11, attached as Ex. P at 1) ("We're talking about 47,000 to 52,000

people from one district to another.")[3]  Senator McCabe explained that a total of seven counties

would move from one congressional district to another under the Snyder amendment compared

to only one county shifted by S.B. 1008, and that the Snyder plan would not improve

compactness because the district would still run from Putnam County in the west to Jefferson

County in the east.  (Id. at 2) ("The plan that was approved yesterday [in the Redistricting

Committee] requires one county to be moved from one congressional district to another.  This

particular amendment requires seven counties to be moved from one district to another. . .  As

best I can tell, the amendment before us in no way affects the length of the district.  It still runs

from Putnam County all the way up to Jefferson County.   So we still have a long district.  In

fact, the action that was taken yesterday by moving Mason County reduced the length of the

district.")

　　　　Senator McCabe also considered the Kanawha Valley as an economic unit when

evaluating communities of interest, stating:

> "The 52,000 people that are in Jackson and Roane, particularly,
> and Wirt are important to Kanawha County.  We, in my home
> county, need to look at that.  We understand the importance of a
> united economy around which our district operates.  And Jackson
> County, Putnam County, and Roane County are key to how we, as
> an economy, operate.  We are talking about moving Jackson and
> Roane counties as well as Wirt to the district to the north of us, to
> the First District and acquiring three other counties in the bottom
> of the Eastern Panhandle in the Second District.  That has an effect
> on how we view the world, how our economy and how our
> counties interact immediately around us."

Id. at 1-2.

---

[3] Senator McCabe was considering only the additional residents moved from one congressional district to another in
Jackson, Roane, and Wirt counties.  Accounting for the fact that residents of Grant, Mineral, and Tucker counties
would also be forced to change congressional districts by the Snyder Amendment, a total of 97,144 additional
residents would move from one congressional district to another under the Snyder Amendment as compared with the
S.B. 1008 as adopted.

Senator Mike Hall explained on the floor that the Senate could reduce the population variance all the way to zero, but doing so would cause the Senate to cut counties – a step that the Senate was not willing to take. (Remarks of Senator Mike Hall, Reapportioning congressional districts, 8/5/11, attached as Ex. Q at 2) ("There is a difference in variance which we could fix by amendment – there are two amendments but they would divide counties – but we could fix the variance issue like the perfect plan did.")

As the debate in both the Senate Redistricting Committee and on the Senate floor make clear, the Senate took into account preserving communities of interest, preserving the existing congressional districts as closely as possible, and avoided splitting any county between congressional districts. The debate demonstrates that Senators understood their constitutional obligation to come as close as practicable to precise population equivalence between congressional districts and to deviate only where necessary to achieve a legitimate objective. Senators placed on the record their legitimate reasons for the minor deviation from zero variance in the plan they adopted, and the record demonstrates that S.B. 1008 as adopted best meets the Legislature's policy objectives.

### E. S.B. 1008 IS SUPERIOR TO OTHER PLANS IN MEETING THE LEGISLATURE'S POLICY OBJECTIVES

As enacted, S.B. 1008 is superior to other plans in meeting the Legislature's principal policy objective of maintaining the stability of Congressional districts, while meeting the requirements of both the U.S. and West Virginia Constitutions, in that it moves the fewest number of citizens from one district to another without splitting counties. All other plans either split counties, or move more counties and people than does S.B. 1008.

At the Redistricting Committee's August 4, 2011 meeting, Senators considered five congressional redistricting proposals. At the request of Senators, staff prepared a draft "zero

variance" redistricting plan which placed 615,665 persons in Congressional Districts 1 and 2, and 615,664 persons in Congressional District 3.  This proposal would have split Harrison County between the First and Second Congressional Districts, and would have split Kanawha County between the First and Third Congressional Districts.  (See attached Ex. R) The proposal also would have shifted 19 counties and 636,187 residents – over 34 percent of the state's population – from one congressional district to another.  Perhaps in recognition of the zero variance plan's failure to achieve the objectives of keeping counties unified within a congressional district and preserving the core of existing districts, this zero variance plan was not introduced as a bill by any Senator or Delegate, nor was it considered as a floor amendment in either the House or the Senate.

At the August 4, 2011 meeting, the Committee first considered an Amendment by Senator Roman Prezioso.  (See attached Ex. S)  Senator Prezioso's amendment would have created a population variance of 1.22 percent – a level which the Legislature considered to be too high under the Federal constitutional standard.  Additionally, the amendment would move nine counties containing 143,605 residents from one district to another.  The amendment was defeated by voice vote.

Senator Prezioso offered a second amendment which mirrored his initial proposal, except that Tucker County, rather than Ritchie County, was moved from the First District to the Second District.  (See attached Ex. T)  While this second amendment had a smaller variance than the first Prezioso amendment, it still had a variance of .44 percent from numerical equivalency. The amendment would still move nine counties from one district to another, and these counties consist of 140,297 residents.  The Committee rejected the second Prezioso amendment.

16

Senator Douglas Facemire next offered an amendment that would have significantly redrawn the state's congressional map, shifting 20 counties and 717,837 residents from one congressional district to another. (See attached Ex. U) Senator Facemire's plan would have placed incumbent Representatives Shelley Moore Capito and David McKinley in the First Congressional District. The districts, as drawn by Senator Facemire, had a population variance of .42 percent. The Senate rejected the Facemire Amendment.

Finally, the Committee considered and adopted an Amendment by Senator Clark Barnes, one of only 6 Republicans in the Senate. The Barnes Amendment kept the three existing congressional districts intact, except for shifting Mason County from the Second District to the Third District. Accordingly, only 27,324 residents - less than two percent of the state's population – were moved from one congressional district to another.

Based on the Barnes Amendment, the Senate Redistricting Committee originated S.B. 1008. Under this plan, which was adopted by the Legislature, the First Congressional District includes 615,991 persons, the Second Congressional District 620,862 persons, and the Third Congressional District 616,141 persons. The plan has a population variance of .79 percent. (See attached Ex. V)

The Senate considered the redistricting issue on the Floor on August 5, 2011. The sole amendment considered on the floor was offered by Senator Herb Snyder. (See attached Ex. W) The Snyder Amendment would have modified the existing congressional districts by shifting Mason County from the Second District to the Third District, shifting Grant, Mineral, and Tucker Counties from the First District to the Second District, and shifting Jackson, Roane, and Wirt Counties from the Second District to the First District. The Snyder Amendment had a population variance of .39 percent. In sum, seven counties totaling 124,468 residents - 6.7

17

percent of the state's population - would have moved from one congressional district to another under the Snyder Amendment.  The Snyder Amendment was defeated by a recorded vote of 14 to 17.  (See Senate Journal, attached as Ex. M, at 52)

Intervening Plaintiff Thornton Cooper submitted three proposed congressional redistricting plans at public hearings held by the Senate's redistricting task force.  The Cooper plans, however, did not comport with the policy objections expressed by the Legislature.  Cooper Plan 1 would have placed incumbent Representatives Nick Rahall and Shelley Moore Capito into the same congressional district.  The plan would also move 23 counties and 813,363 residents – 43.8 percent of the state's population – from one district to another.  (See attached Ex. X) Cooper Plan 2 would also place Rahall and Capito in the same district, while shifting 20 counties totaling 949,065 residents from one district to another.  (See attached Ex. Y)   Cooper Plan 3 would move 21 counties totaling 746,732 residents – over 40 percent of the state's population from one district to another.  (See attached Ex. Z) The three plans submitted by Cooper had small population variances, but were so out of step with the Legislature's objective of preserving existing congressional districts and avoiding contests between incumbents, as well as the state's four decade tradition of making the smallest changes possible in reapportionment, that no member of the Legislature saw fit to introduce any of Cooper's plans as a bill or as an amendment.

During the course of this litigation, Cooper proposed a fourth plan.  This plan would split Taylor County between the First and Third Congressional Districts.  Additionally, this fourth Cooper plan would shift more than one-third of the state's residents from one district to another. Aside from its failure to comport with the Legislature's policy objectives of keeping counties intact and preserving existing congressional districts, Cooper's fourth plan, unlike all other plans

considered, was not available to the Legislature when it approved S.B. 1008 and has not been the subject of public or legislative consideration.

## III.  LEGAL ARGUMENT

Jefferson County and Cooper each challenge the constitutionality of Senate Bill 1008. Jefferson County's challenge to West Virginia's congressional redistricting is based upon three constitutional provisions: the Equal Protection Clause of the Fourteenth Amendment to United States Constitution (Count I), Article I, Section 2 of the United States Constitution (Count I), and Article I, Section 4 of the West Virginia Constitution (Count II & Count III). [Doc. 1 at pp. 6-7] The challenges in Count I and Count II of the Complaint arise from the variances in population in the three congressional districts. *Id.* The challenge in Count III stems from the claim that the shape of the new Second Congressional District violates the compactness requirements of Article I, Section 4 of the West Virginia Constitution. *Id.* at p. 7. Cooper, based on Article I, Section 2 of the United States Constitution and Article I, Section 4 of the West Virginia Constitution, only makes the challenge based on population variances. [Doc. 15 at p.7]

In determining similar challenges to the 1990 West Virginia congressional redistricting, this Court's predecessor three judge panel cautioned:

> The Supreme Court has repeatedly stated that "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to preempt." *Wise v. Lipscomb,* 437 U.S. 535, 539, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). Further, a federal district court "should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution" in the context of congressional reapportionment. *White v. Weiser,* 412 U.S. 783, 795, 93 S.Ct. 2348, 2355, 37 L.Ed.2d 335 (1973).

*Stone v. Hechler*,  782 F.Supp. 1116, 1124 (N.D. W.Va. 1992).  Thus, this Court should not lose

sight of the fact that redistricting is inherently political:

> "'[W]hether or not nonpopulation factors are expressly
> taken into account in shaping political districts, they are inevitably
> everpresent and operative. They influence all election outcomes in
> all sets of districts. The key concept to grasp is that there are no
> neutral lines for legislative districts ... every line drawn aligns
> partisans and interest blocs in a particular way different from the
> alignment that would result from putting the line in some other
> place.' Dixon, Fair Criteria and Procedures for Establishing
> Legislative Districts 7-8, in Representation and Redistricting Issues
> (B. Grofman, A. Lijphart, R. McKay, & H. Scarrow eds. 1982)."

*Davis v. Bandemer*, 478 U.S. 109, 129, 106 S.Ct. 2797, 2808 (1986).  Simply put, the choice

between various constitutional plans is a matter of legislative judgment and not a proper function

for a court specially comprised to determine the constitutionality of the plan ultimately adopted.

After careful consideration of both the constitutional requirements and traditional

concepts of sound redistricting, the West Virginia Legislature enacted Senate Bill 1008 after

determining that legitimate state policies justified both the variance in population and the

geographic configuration of the districts.  For the reasons noted below, this Court should reject

both the Jefferson County and Cooper challenges.

**A.      SENATE BILL 1008 COMPLIES WITH THE POPULATION EQUALITY
REQUIREMENTS OF THE UNITED STATES CONSTITUTION AND
THE WEST VIRGINIA CONSTITUTION AS THE SMALL INTER-
DISTRICT DEVIATIONS IN POPULATION IN SENATE BILL 1008 ARE
JUSTIFIED BY TRADITIONAL REDISTRICTING PRINCIPLES THAT
EMBODY LEGITIMATE STATE POLICY OBJECTIVES.**

**1.      The Plaintiffs' Population Equality Challenges in this Case are
Governed by Article I, Section 2 of the United States Constitution.**

As noted above, the Plaintiffs cite three different constitutional provisions in support of

their population equality challenge to Senate Bill 1008.  An examination of the provisions and

20

the judicial decisions interpreting them establishes that the population equality challenges in this case are governed by Article I, Section 2 of the United States Constitution.

Article I, Section 2 of the United States Constitution provides that the members of the House of Representatives shall be chosen "by the People of the several States." In *Wesberry v. Sanders*, 376 U.S. 1, 7-8, 84 S.Ct. 526, 530 (1964), the Supreme Court held that this command "means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Id.* (footnote omitted). The Court concluded by stating that equal representation is the goal: "While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives." *Id.* at 18, 84 S.Ct. at 535.

With respect to congressional districts, Article I, Section 4, of the West Virginia Constitution requires that: "Each district shall contain as nearly as may be, an equal number of population to be determined according to the rule prescribed in the constitution of the United States." By its explicit terms, this provision incorporates the standard for population equality set forth in the United States Constitution. In addition, this Court's 1992 predecessor rejected the idea that the state provision requires a stricter standard for population variance than the Federal constitutional requirements. *See Stone v. Hechler*, 782 F.Supp. at 1128. Thus, because the West Virginia Constitution does not impose different or stricter requirements for population equality challenges, it is not necessary to separately analyze Article I, Section 4, of the West Virginia Constitution.

Finally, Jefferson County cites the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in support of its population equality challenge. The Supreme

Court evaluates population equality claims for congressional districts solely under Article I, Section 2, reserving the Equal Protection Clause analysis for population equality challenges to the reapportionment of state legislative districts. *See Gaffney v. Cummings*, 412 U.S. 735, 741-42, 93 S.Ct. 2321, 2325-26 (1973); *Mahan v. Howell,* 410 U.S. 315, 322, 93 S.Ct. 979, 984 (1973); *see also Brown v. Thomson*, 462 U.S. 835, 850, n.2, 103 S.Ct. 2690, 2700, n.2 (1983) (O'Connor, J., Concurring) ("The Court has recognized that States enjoy a somewhat greater degree of latitude as to population disparities in a state legislative apportionment scheme, which is tested under Equal Protection Clause standards, than in a congressional redistricting scheme, for which the Court has held that Art. I, § 2 of the Constitution provides the governing standard."). Indeed, *Reynolds v. Sims*, 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, (1964), the case cited by Jefferson County [Doc. 1 at ¶ 35], involved state legislative apportionment not congressional districts. Likewise, population equality challenges to congressional districts in West Virginia have focused on Article I, Section 2. *Stone v. Hechler, supra; West Virginia Civil Liberties Union v. Rockefeller*, 336 F.Supp. 395, 397 (D. W.Va. 1972).

The less than 1% population deviation created by Senate Bill 1008 would be insufficient to create a prima face case of an equal protection violation. *Brown v. Thomson* 462 U.S. at 842-43, 103 S.Ct. at 2696 ("[W]e have held that minor deviations from mathematical equality . . . . are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment. . . . [A]n apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations." (citations and internal quotations omitted)). Thus, even if equal protection analysis is appropriate, any equal protection challenge here fails to set forth a prima facie case.

Thus, for these reasons, this Court should judge the population equality challenges to Senate Bill 1008 solely on the basis of Article I, Section 2 of the United States Constitution.

> **2.      Article I, Section 2 of the United States Constitution Permits Small Inter-District Deviations in Population to be Justified by Legitimate State Policy Objectives.**

The Supreme Court first adopted the modern population equality standard of Article I, Section 2 of the United States Constitution in *Wesberry, supra*.  As the West Virginia three-judge panel recognized in *Stone v. Hechler*, 782 F.Supp. at 1124, the Supreme Court refined the *Wesberry* requirements in *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225 (1969) and *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983).  *Kirkpatrick* created and *Karcher* reaffirmed a two-step test for determining the constitutionality of congressional reapportionment legislation.

In *Stone v. Hechler*, the West Virginia Court described the *Kirkpatrick/Karcher* test:

> [T]he party challenging the constitutionality of a congressional redistricting plan bears the burden of proof of first showing that "the population differences among districts could have been reduced or eliminated altogether by a good faith effort to draw districts of equal population." [*Karcher, supra*] at 730–31, 103 S.Ct. at 2658. If the party challenging the redistricting plan can demonstrate that the population variations could have been avoided, "the burden of proving that each significant variance between the districts was necessary to achieve some legitimate goal" shifts to the State. *Id.* at 731, 103 S.Ct. at 2658 (citing *Kirkpatrick,* 394 U.S. at 532, 89 S.Ct. at 1229–30; *Swann v. Adams,* 385 U.S. 440, 443–44, 87 S.Ct. 569, 571–72, 17 L.Ed.2d 501 (1967)).

*Stone v. Hechler*, 782 F.Supp. at 1124.

Both *Karcher* and *Kirkpatrick* make it clear that states are not required to reduce the population variance to the numerical minimum variance. Instead, in step two of the test, the State has the burden to justify the variance:

> Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives. As long as the criteria are nondiscriminatory these are all legitimate objectives that on a proper showing could justify minor population deviations.

*Karcher*, 462 U.S. at 740-41, 103 S.Ct. at 2663-64 (citation omitted). Finally, the Supreme Court has made it clear that the test under step two is a flexible one:

> The showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely.

*Karcher, supra* at 741, 103 S.Ct. at 2664. In determining these issues, this Court has traditionally looked favorably on congressional redistricting legislation that is adopted with wide-spread, bipartisan support. *See West Virginia Civil Liberties Union v. Rockefeller*, 336 F.Supp. at 399 ("In contrast [to *Kirkpatrick*], the record here reveals the legislation was remarkably free of partisan politics, it having been adopted with genuine by-party support in both the committee and the legislative body.").

Finally, while there is no variance under the Supreme Court's current jurisprudence that can be considered *de minimus*, variances less than 1% have been deemed acceptable in stage two of *Kirkpatrick/Karcher* when they are accompanied by nondiscriminatory legislative policies --

even in the face of alternative plans that have smaller variances.  *See, e.g., Skolnick v. State Electoral Bd. of Ill.*, 336 F.Supp. 839, 843 & n.2, 846 (D.C.Ill., 1971) (after considering four plans with 1% variance or less, Court adopted plan with total variance of 0.75% which was third largest variance); *Doulin v. White*,  535 F.Supp. 450, 452 (D.C.Ark., 1982) (after finding adopted state plan with 2.10% variance unconstitutional, Court adopted previous version that had passed one house of legislature  with .78% variance and rejecting six plans with variances as low as .13%); *Turner v. State of Ark.*,  784 F.Supp. 585, 589 (E.D.Ark. 1991) (rejecting challenge to plan with .73% variance in spite of proposed alternatives with variances of .65% and .41% finding that alternatives failed to meet the twin objectives of causing the fewest changes in the location of counties and people as well as adopted plan).

Of course, the most notable rejection of a challenge to a plan with a less than 1% variance was this Court's opinion in *West Virginia Civil Liberties Union v. Rockefeller, supra,* which rejected a challenge to the West Virginia congressional districts adopted after the 1970 census which had a total deviation of .78% finding that state had justified the rejection of plans with lower variances on the basis of the desire to comply with the West Virginia Constitution's contiguity and compactness provisions.   336 F.Supp at 399-400.   In doing so, the Court emphasized that, in conducting the part-two analysis of the *Kirkpatrick* test, a less than 1% variation made the State's burden slight. *See id.* at 399 ("Obviously, it would be very difficult to markedly reduce the variances in a plan which, in fact, only varies 0.35% above and 0.43% below the mathematical ideal."); *see also Skolnick,* 336 F.Supp. at 843 (Court specifically found that four plans with less than 1% variance were indistinguishable on population basis -- "the variances in each plan are so small that the only way to distinguish among them is to consider what non-population factors went into the drawing of each.").

    **3.**    **The Small Inter-District Deviations in Population in Senate Bill 1008 are Justified by the Consistently Applied State Policy Objectives of Making Districts Compact, Respecting Municipal Boundaries, Preserving the Cores of Prior Districts, and Avoiding Contests Between Incumbent Representatives.**

In enacting Senate Bill 1008, the West Virginia Legislature was cognizant of the requirements of the *Kirkpatrick/Karcher* test.  Senate Bill 1008 was adopted in spite of the fact that alternatives with lower variances existed because the Legislature determined that the consistently applied policy objectives of making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent representatives justified the small variances between districts.  *See Karcher, supra.*  Because each of the four policy objectives identified in *Karcher* exist here, the Legislature easily meets its burden under the second step in the *Kirkpatrick/Karcher*  test.

As an initial matter, it is significant that partisan politics did not underlay the enactment of Senate Bill 1008.  The bill was passed in both houses by a substantial, bi-partisan vote.  Indeed, the Democratic controlled Legislature rejected alternative proposals that would increase the likelihood of replacing the two Republican incumbent representatives.  The Governor who signed this bill was also a Democrat.  Like the 1970s redistricting at issue in *West Virginia Civil Liberties Union v. Rockefeller*, "the record here reveals the legislation was remarkably free of partisan politics, it having been adopted with genuine by-party support in both the committee and the legislative body."  In judging the Legislature's justifications under the *Kirkpatrick/Karcher* test, this Court should give great weight to the non-partisan environment in which the congressional redistricting bill was adopted.

The first consistently applied policy objective supporting the adopted plan is the objective of making districts compact.  As the Court recognized in both *West Virginia Civil Liberties*

*Union v. Rockefeller* and *Stone v. Hechler,* the West Virginia Constitution's compactness requirement constitutes a valid policy objective that can justify the small population deviations in the plan. *See Stone v. Hechler,* 782 F.Supp at 1128; *West Virginia Civil Liberties Union v. Rockefeller,* 336 F.Supp at 399.   Indeed, in *West Virginia Civil Liberties Union v. Rockefeller,* the Court found compactness alone was sufficient to justify a plan adopted in a non-partisan atmosphere in spite of a .78% deficiency.

As noted above, the plan at issue here is clearly more compact than the plan approved in 1972.   Similarly, the plan found to be compact in *Stone v. Hechler,* in 1992 was the forerunner of the current plan.  The shift of Mason County from the Second District to the Third District in Senate Bill 1008 makes the Second district more compact than the district approved in *Stone v. Hechler.*   *West Virginia Civil Liberties Union v. Rockefeller* and *Stone v. Hechler* establish that balancing compactness with other factors has been a consistent policy objective in the setting of West Virginia's congressional districts.

The second state policy approved by *Karcher* is respecting municipal boundaries.   West Virginia's constitution requires congressional districts to "be formed of contiguous counties." W.Va. Const. art. I, § 4.  Both *West Virginia Civil Liberties Union v. Rockefeller* and *Stone v. Hechler* explicitly approve consideration of this requirement as part of the *Kirkpatrick/Karcher* test.  *See Stone v. Hechler,* 782 F.Supp. at 1129 (citing *West Virginia Civil Liberties Union v. Rockefeller,* 336 F.Supp. at  399).   As noted above, preservation of county lines has been a consistent part of West Virginia's congressional district plans.  Senate Bill 1008 does not split

any counties.[4]   The same cannot be said for many of the options considered and rejected or proposed by the Plaintiffs. *See, infra* pp. 15-19.

The third policy approved by *Karcher* is preserving the cores of prior districts.    *Stone v. Hechler, supra* recognized that preserving district cores was a valid state policy. 782 F.Supp. at 1127.  In that case, a plan which severed two counties and 47,252 people was determined to be consistent with this policy goal.  782 F.Supp. at 1127 & n.18.  The history of West Virginia congressional districts shows a concerted effort to preserve district cores – even in the face of the loss of a representative as was the case in the 1990's redistricting.     Here only a single county and 27,324 people are severed from the prior district.  Each of the competing plans sever more people.   The consistently applied policy of preserving district cores serves as an adequate justification for the variance contained in Senate Bill 1008.

Finally, the fourth policy approved by *Karcher* is avoiding contests between incumbent representatives.     Senate Bill 1008 separates the residences of each of the incumbent West Virginia congressional representatives.  Four of the competing plans have the residences of two of the representatives in a single district.    In modern West Virginia redistricting, incumbent representatives have been placed in the same district only when necessary because of the loss of a congressional seat in the reapportionment process. *See, e.g., Stone v. Hechler*, 782 F.Supp. at 1118; *West Virginia Civil Liberties Union v. Rockefeller,* 336 F.Supp. at 396.  Redistricting in 1980 and 2000 did not place incumbents in the same districts.  That this is a consistent policy of

---

[4]As noted above, Senate Bill 1008 was also designed to keep together as much as possible various communities of interest.  While not specifically identified in *Karcher,* this is a valid state policy that can support a deviation.  *See Abrams v. Johnson,*  521 U.S. 74, 100, 117 S.Ct. 1925, 1940 (1997) (recognizing that small counties represent communities of interest); *Karcher,* 462 U.S. at 758, 103 S.Ct. 2653 (Stevens, J., concurring) ("Residents of political units such as townships, cities, and counties often develop a community of interest…"); *Marylanders for Fair Representation, Inc. v. Schaefer* 849 F.Supp. 1022, 1036 (D.Md. 1994) (finding protection of communities of interest valid state policy under *Karcher); Puerto Rican Legal Defense and Educ. Fund, Inc. v. Gantt,* 796 F.Supp. 681, 687 (E.D.N.Y. 1992) (same).

the state is evident by the fact that it has been upheld by the Democratic majority in the Legislature and the Democratic Governor in spite of the fact that two of the incumbent representatives are now Republicans.

The variances in this case are supported by all four of the potential justifications identified in *Karcher*. None of the competing plans come close to meeting these four consistently applied state policies. As such, the State has met its burden of establishing that the small deviations in the populations of the three congressional districts are justified by consistently applied legitimate state policies.

> **4.** **The Small Inter-District Deviations in Population in Senate Bill 1008 are De Minimus and are not Constitutionally Significant.**

The West Virginia Legislature believes that it made a good-faith effort to achieve the population equality required by Article I, Section 2 of the United States Constitution. The Legislature believes that population variances below 1% are statistically insignificant and are insufficient to establish a prima facie case of a violation of Article I, Section 2 of the United States Constitution. Challenges to insignificant variances create uncertainty in the electoral process and expensive and time consuming litigation for the State and the constitutional officers sued herein. The Legislature acknowledges that its belief is contradicted by the opinions in *Kirkpatrick, Karcher,* and *Stone v. Hechler*. While ample justification exists, the State does not concede that it is necessary for it to justify the variances and reserves the right to seek modification of the holdings of these cases if necessary on appeal or cross-appeal of any judgment entered by this Court.

> **B.** **SENATE BILL 1008 COMPLIES WITH THE COMPACTNESS REQUIREMENTS OF ARTICLE I, SECTION 4 OF THE WEST VIRGINIA CONSTITUTION.**

Only Jefferson County challenges the Senate Bill 1008 on the grounds that the new congressional redistricting plan fails to meet the compactness requirement of the West Virginia Constitution. This challenge fails.

First, any determination of compactness must take into account the peculiar characteristics of West Virginia geography:

> Physical characteristics of West Virginia are significant to the determination of compactness issues. To the extent that it was not specifically covered by record evidence, the Court takes judicial notice of the State's unique geographical configurations. There are two narrow panhandles. The northern panhandle, consisting of four counties, extends between the borders of Ohio and Pennsylvania. The eastern panhandle, consisting of eight counties and part of a ninth, is bordered by Maryland and Virginia. This is compounded, of course, by the irregular boundaries of counties within the State, which are largely determined by rivers and mountain ranges. Finally, these problems must be reconciled with the West Virginia constitutional requirement that districts be drawn with adherence to county lines. Likewise, we judicially notice: the mountainous terrain throughout the State with particularly rugged portions of the Appalachian range in the south and southwest; the fairly long and broad valleys formed by the Ohio and Kanawha Rivers; the contrast in quality of road transportation between areas served by Interstate Highways 64, 68, 70, 77, 79, and 81 and those serviced by often poorly developed mountain highways in various parts of the State; the sharply contrasting concentrations of population, for example, Kanawha County has an official population of 207,619 and a total area of 913.338 square miles while the contiguous Clay County has a population of 9,983 and a total area of 346.61 square miles; and that this sharp variation between the few areas of concentrated populations and sparsely populated contiguous areas exists throughout the State.

*Stone v. Hechler*, 782 F.Supp. at 1123.   While the West Virginia population has changed somewhat since 1990, its geography has not.

The basic configuration of the current Second Congressional District was constructed by the redistricting of 1991, when the number of Representatives to which West Virginia is entitled was reduced from four to three.  In the redistricting of 2001, the Second Congressional District was reduced in area, by removing two counties that contained a total of 994 square miles.  S.B. 1008 further reduces the area of the Second Congressional District, by removing Mason County that contains 445 square miles. The result is that the Second Congressional District will now be comprised of almost precisely one third of West Virginia's 24,231 square miles.  By removing Mason County, S.B. 1008 also shortens the distance from the eastern edge of the District in Jefferson County to the western edge, which will now be in Putnam County instead of Mason.

The Second Congressional District is clearly more compact under S.B. 1008 than under the current structure enacted in 2001, as it simply removes Mason County on its western edge, and Plaintiffs have not stated that this removal causes an issue with the compactness requirement under the state Constitution.

The Court in *Stone v. Hechler* considered the compactness question in the context of a congressional district plan that varied very little from the plan enacted by Senate Bill 1008. On the issue of compliance with West Virginia Constitution's  Article I, Section 6 compactness requirement the Court held:

> After reviewing the experts' calculations and considering the floor debate and record evidence, we have come to the view that Plan II follows the West Virginia constitutional dictate that districts be compact. The West Virginia Constitution does not define compactness but imposes upon the State Legislature the obligation to consider it as a principal factor in apportioning congressional districts. The Legislature was aware both of the state constitutional requirement and the effect of compactness in the federal constitutional equation. We think it has been adequately demonstrated that each legislative body kept the concept of compactness as a principal goal of its redistricting efforts and did

31

> this primarily in pursuit of fulfilling its State constitutional
> obligations. The fact that there were other Plans that would be
> deemed more compact than Plan II under the three tests employed
> by the experts does not detract from the Legislature's effort. In the
> legislative view, the districts in Plan II were compact as the
> Legislature viewed that requirement under the West Virginia
> Constitution, and in weighing that and other legitimate legislative
> goals it was acting preeminently in a role reserved to a state
> legislature by the United States Supreme Court.

*Stone v. Hechler*, 782 F.Supp. at 1128. Mathematically and conceptually, the plan adopted by

Senate Bill 1008 is more compact than the Plan II at issue in *Stone v. Hechler.*

Jefferson County has offered no reasoned basis for concluding that the districts in Senate

Bill 1008 are not compact. Its challenge is, in reality, a challenge to the original conclusion in

*Stone v. Hechler.* Ironically, comparing the Senate Bill 1008 districts and the 1990 districts in

*Stone v. Hechler* with the 1980 districts that preceded them shows that the basic configuration

used since 1990 is more compact than the 1980 districts they replaced.

Notably, the Plaintiffs' expert in *Stone v. Hechler* was Thornton Cooper, the intervening

Plaintiff in this case. Mr. Cooper's complaint does not challenge Senate Bill 1008 on

compactness grounds. Simply put, Jefferson County cannot meet its burden of establishing that

Senate Bill 1008 violates the compactness requirements of Article I, Section 6 of the West

Virginia Constitution.

## IV.    CONCLUSION

In presenting the various alternative plans either not considered or considered and

rejected, the Plaintiffs seek to improperly lead the Court into refereeing a debate over which plan

is the best plan. That is not the function of this Court which is limited to determining only

whether Senate Bill 1008 complies with the United States and West Virginia Constitutions.

Some of the alternative plans may be constitutional. Some may think the alternative plans are

better.  Choosing between constitutional plans is the function of the Legislature whose judgment

on that question this Court is not permitted to address:

> [T]he Court is of the opinion that it is obligated to give deference
> to the decision of the Arkansas Legislature, whose duty it is, after
> all, to formulate and enact a redistricting plan. The Court finds that
> the guideline decisions made by the legislature concerning
> redistricting were legitimate and reasonable and were also within
> its competence to make. The mal-apportionment claim of the
> plaintiffs and of the Lonoke County intervenor, Mr. Malone, must
> therefore be dismissed.

*Turner v. State of Arkansas,* 784 F.Supp. at 589.  Because Senate Bill 1008 complies with all

relevant constitutional requirements, the complaints herein should be dismissed.

<table>
<tr>
<td>

**JEFFREY KESSLER, in his capacity**
**as President of West Virginia Senate**

/s/ George E. Carenbauer
_____
George E. Carenbauer (W. Va. Bar No. 634)
Adam B. Tomlinson (W. Va. Bar No. 11311)
STEPTOE & JOHNSON PLLC
707 Virginia Street, East, Eighth Floor
P.O. Box 1588
Charleston, WV  25326-1588
(304) 353-8000 - telephone
(304) 353-8180 - facsimile
george.carenbauer@steptoe-johnson.com
adam.tomlinson@steptoe-johnson.com
Attorneys for President Kessler

</td>
<td>

**RICHARD THOMPSON, in his capacity as the**
**Speaker of the West Virginia House of Delegates**

/s/ Anthony J. Majestro
_____
Anthony J. Majestro (W. Va. Bar No. 5165)
Cynthia A. Majestro (W. Va. Bar No. 5092)
Powell & Majestro, PLLC
405 Capitol Street, Suite P1200
Charleston, WV 25301
(304) 346-2889 – telephone
(304) 346-2895 – facsimile
amajestro@powellmajestro.comj
cmajestro@powellmajestro.com
Attorneys for Speaker Thompson

</td>
</tr>
</table>

## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA
### At Charleston

**JEFFERSON COUNTY COMMISSION, et. al.**
    **Plaintiffs,**

and

**THORNTON COOPER,**
    **Intervening Plaintiff,**

**v.**
                                **Civil Action No. 2:11-CV-00989**
                                **(Judges King, Bailey, and Berger)**

**NATALIE TENNANT,** *in her capacity as*
*The Secretary of State*, **et al.,**
    **Defendants.**

## CERTIFICATE OF SERVICE

    I hereby certify that on the 20th day of December, 2011, I electronically filed the foregoing "**Joint Opening Brief of Defendants Jeffrey Kessler and Richard Thompson**" with the Clerk of the Court using the CM/ECF system which will provide notice to counsel of record as follows:

David M. Hammer, Esq.
Hammer, Ferretti & Schiavoni
408 W. King Street
Martinsburg, WV 25401
*Counsel for Plaintiffs*


Thornton Cooper, Esq. *pro se*
3015 Ridgeview Drive
South Charleston, WV 25303

Stephen G. Skinner, Esq.
Skinner Law Firm
P O Box 487
Charles Town, WV 25414
*Counsel for Plaintiffs*

Thomas Rodd, Esq
West Virginia Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301
*Counsel for the Secretary of State and
the Governor*

        /s/ Adam B. Tomlinson
        Adam B. Tomlinson (W. Va. Bar No. 11311)