IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JEFFERSON COUNTY COMMISSION;
PATRICIA NOLAND, as an individual
and behalf of all others similarly situated;
and DALE MANUEL, as an individual and
behalf of all others similarly situated,

      Plaintiffs, and

THORNTON COOPER,

      Intervening Plaintiff,

v.                                     Civil Action No. 2:11-CV-989
                                                        (KING, BAILEY, BERGER)

NATALIE E. TENNANT, in her capacity as
the Secretary of State; EARL RAY TOMBLIN,
in his capacity as the Chief Executive Officer
of the State of West Virginia; JEFFREY
KESSLER, in his capacity as the Acting
President of the Senate of the West Virginia
Legislature; and RICHARD THOMPSON, in
his capacity as the Speaker of the House of
Delegates of the West Virginia Legislature,

      Defendants.

**PLAINTIFFS JEFFERSON COUNTY COMMISSION, PATRICIA NOLAND, AND DALE MANUEL'S BRIEF IN RESPONSE TO JOINT OPENING BRIEF OF DEFENDANTS JEFFREY KESSLER AND RICHARD THOMPSON**

      The Jefferson County Commission, Patricia Noland, and Dale Manuel, Plaintiffs, by their Counsel, submit this Response Brief to this Honorable Court.

1

Defendants' position can be summed up thus:  Maintaining the *status quo ante* is more important than the Constitutional mandate of one-person, one vote, and since very few legislators, Democrat or Republican, complained, the people who have been disenfranchised should not complain either.

The Plaintiffs challenged the congressional districting plan approved by the West Virginia Legislature and signed by the Governor based upon two separate grounds:  first, a violation of the one person, one vote mandate of the United States and West Virginia Constitutions and second, a lack of compactness.

**I.**     ***Kirkpatrick/Karcher* Test – First Step**

All agree that the *Kirkpatrick/Karcher* test applies.  This test specifies a two-step analysis for how challenges to the constitutionality of congressional reapportionment should proceed. The first step is that the challenger to a redistricting must show that mathematical equality among districts was not achieved.  *Karcher v. Daggett,* 462 U.S. 725, 103 S.Ct. 2653 (1983).  Defendants concede, as they must, that the bill that passed fails the first step of the *Kirkpatrick/Karcher* test.[1]  There are 4,871 more people in the 2nd Congressional District than in the smallest district.  This translates into an overall

---

[1] It might not be entirely accurate to say that Defendants *concede* that the congressional district boundaries they have drawn are not mathematically equal.  The Defendants actually fail to address the topic, thus, by default, conceding.  What the Defendants do is simply skip the first step of the *Kirkpatrick/Karcher* test and start attempting to justify their extreme variance.  *See* Defendants' Joint Brief, at 23-24.  What is extraordinary is that the Defendants then state in III, A., 4. that they disagree with the U.S. Supreme Court's opinion that there is no such thing as a de minimus variance.  Instead, Defendants assert that they should not even have to justify their variance.  In essence, they have asserted that they can do whatever they want and no court should be able to second-guess their wants.  This, obviously, is not the law in the United States.  Instead, the law states "that there are no *de minimus* population variations which could practicably be avoided, but which nonetheless meet the standard of Art. I, §2, without justification.  *Karcher*, 462 U.S. at 743, 103 S.Ct. at 2665.  This is because "If state legislators know that a certain *de minimis* level of population differences were acceptable, they would doubtless strive to achieve that level rather than equality.  *Id.* at 731, 2569.

deviation of 0.79%.  In other words, 4,871 people in the 2nd Congressional District are irrelevant.

According to a 2004 report from the National Conference of State Legislatures on the round of redistricting based on the 2000 census figures, the 4,871 people disenfranchised in the current West Virginia redistricting is larger than what the range was in *every single state* in the last round of redistricting.  See Exhibit A (Redistricting 2000 Population Deviation Table).  Thirty-nine states had a range of less than 1,000 persons, with nineteen of those states having a range of either 0 or 1 person.  Seven states consist of a single district where there is nothing to redistrict.  Only four states had a range over 1,000 persons.  Idaho was the furthest from perfect mathematical equality.  The overall range in Idaho from the 2000 redistricting was 3,595 people, which translated to a deviation of 0.60%.  Not only did Idaho have the highest range, but it was a substantial aberration from most states.  The next highest range was 2,476 people in Massachusetts, translating into a deviation of 0.39%.  The next was Hawaii with a range of 1,899 people, meaning a deviation of 0.32%.  West Virginia had a range of 1,313 people, or 0.22%.  Of the remaining states, only New Hampshire breached the tenth of a percentage point barrier with its range of 636 people, the fifth largest range (which itself was more than double the next closest).

If this Court were to approve the current plan, West Virginia would be an extreme outlier, dwarfing Idaho's previous outlier position after the last redistricting by a whopping 1,276 people and 0.19%.  Despite West Virginia's position as an extreme

3

outlier, the Defendants persist in maintaining the position they have staked out. In fact, Defendants repeatedly assert that the deviance is a minor variation.

## II.     *Kirkpatrick/Karcher* Test – Second Step

Under the *Kirkpatrick/Karcher* test, where the challenger shows that mathematical equality has not been achieved, then the burden shifts to the State to show that the variances are either unavoidable or that the variances are justifiable. *Karcher*, 462 U.S. 725, 103 S.Ct. 2653. There is no question that the variances in the instant case were avoidable, as the first proposal had zero variances, except for the variance of one person that was mathematically mandated by the fact that the total population of West Virginia was not divisible by three without a remainder. Instead of an overall range of 0 or 1, there is a range of 4,871; therefore, the Court must analyze S.B. 1008 under the second step of the test.

Because there was a variance and because the variance was avoidable, the state must specifically justify its variances. Where, as here, the variance from mathematical equality is especially large, especially in comparison to the other States, it logically follows that there must be a very good reason for the variance. The Defendants present no very good reason at all. Instead, they cobble together several rationales, no one of which could possibly pass muster, and hope that such an amalgamation will slip by.

Where the Defendants' amalgamation fails is that the State must "…show with some specificity that a particular objective required the specific deviations in its plan, rather than simply relying on general assertions." *Karcher*, 462 U.S. at 741, 103 S.Ct. at 2664. What Defendants have offered is mere general assertions, at best. More

accurately, those general assertions consist of unsubstantiated claims, opinions, and conclusory assertions.[2]

### A.      Incorrect Factual Assertions

Defendants focus the majority of their opening brief not on legal issues but on an attempt to create an unsupported factual record. Defendants' brief is an attempt to hijack the briefing process to create a record rather than a reasoned application of the substantive law to the issues at hand.  Moreover, the portion of the opening brief titled "Relevant Facts" is not a statement of the facts at all.  Assertions that the Defendants attempt to establish as "fact" include the following:

> 1.      *Because the Legislature adopted a redistricting plan that has already been found compact, because the population variance is a mere one-hundredth of a percent higher than the variance expressly approved by this Court and implicitly approved by the United States Supreme Court*, and most importantly, because the variance from numerical equivalency is justified by the Legislature's expressed desire to achieve legitimate policy objectives, the Court should uphold the constitutionality of S.B. 1008. (Defendants' Joint Brief, at 2, emphasis added).

In fact, the redistricting plan at issue has not "already been found compact" nor has the variance at issue been "expressly approved by this Court." Because the population shifts that necessitate regular redistricting are rarely identical in nature or composition, no one redistricting plan can be considered "approved" simply because its variance is close to a variance from forty years before, nor can a redistricting pass muster merely because one that appears facially similar previously existed.  As the *Karcher* Court emphasized, "The whole thrust of the 'as nearly as practicable' approach

---

[2] Plaintiffs learned this afternoon that Defendants were able to add to the official Senate record after the fact.  This in itself is telling:  Defendants are scrambling to get their justifications in the record long after the actual occurrences.

is inconsistent with adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case." 462 U.S. at 731, 103 S.Ct. at 2658 (quoting *Kirkpatrick v. Preisler,* 394 U.S. 526m 530, 89 S.Ct. 1225, 1228 (1969)). Each case must be viewed on its own, unique merits, and for Defendants to assert otherwise is misleading.

> 2. [S.B. 1008] has a population variance of .79 percent, which is virtually identical to the .78 percent variance approved by the 3-judge Federal panel in the *Rockefeller* case, which was implicitly upheld by the U.S. Supreme Court in *Karcher*. (*Id.* at 3)

Defendants point out that in the *Karcher* decision, the U.S. Supreme Court favorably cited to the 0.78% deviation in *West Virginia Civil Liberties Union v. Rockefeller*, 336 F.Supp. 395 (1972), which was upheld by a predecessor to this three-judge panel. Defendants' Joint Brief, at 2, 5. Based on this citation, Defendants suggest that the U.S. Supreme Court implicitly approves of deviations of 0.78%. Defendants also argue that since this Court approved a 0.78% deviation in the 1970's and since that deviation was cited by the U.S. Supreme Court in the 1980's, then a 0.79% deviation in the 2010's should be approved.

What Defendants fail to point out in their brief is that the U.S. Supreme Court rejected a deviation of 0.6984% in the *Karcher* decision, which is a substantially smaller deviation from the one this Court is now considering. Courts have rejected much smaller deviations even than 0.6948%. *See, e.g., Vieth v. Pennsylvania*, 195 F. Supp. 2d 672 (M.D. Pa. 2002) (ruling that a congressional plan with an overall range of 19 people was unconstitutional based on the finding that the justification offered by the state

6

(avoiding split precincts) could be more closely achieved by alternative plans with minimum possible population deviations and that the justification was not the actual cause of deviation), appeal dismissed as moot sub nom. *Schweiker v. Vieth*, 537 U.S. 801 (2002) (mem.).

> 3. It is clear that, despite containing an unusually strong majority of Democrats, the Legislature chose its longstanding principle of stability over partisan advantage and even over personal advantage to colleagues and friends. (*Id*. at 8).

To the contrary, from the record, this "fact" is not clear at all. Defendants have provided nothing but their own, biased opinions and interpretations to support their claim that the redistricting decisions at issue in this action resulted from a choice between the principle of stability and partisan advantage. Nothing in the record, even that portion of the record added *post facto* by Defendants, supports this claim.

> 4. THE LEGISLATURE CLEARLY EXPRESSED ITS LEGITIMATE POLICY OBJECTIVES . . . (*Id*. at 10 – 15).

Many of the statements contained within Exhibit O and used to support Defendants' contentions are simply untenable. For instance, there is a quote from Sen. Barnes on page 13 of the Defendants' brief wherein he states, "In the northern part, I can tell you that the areas around Keyser, the areas around Marshall County and all, there's a lot of commonality between those two areas even though they're on different sides of the state." Simply stating that there are communities of interest between Mineral and Marshall Counties does not make it so. Likewise, simply stating that Kanawha County and Berkeley County have common interests because they have the largest populations in the state does not mean they actually do have anything in common. While it is

7

possible that Mineral and Marshall Counties or Kanawha or Berkeley Counties have similar interests, those interests must be thoroughly documented and specifically explained to justify the disenfranchisement of 4,871 West Virginians.

> 5. As enacted, S.B. 1008 is superior to other plans in meeting the Legislature's principal policy objective of maintaining the stability of Congressional districts, while meeting the requirements of both the U.S. and West Virginia Constitutions, in that it moves the fewest number of citizens from one district without splitting counties. (*Id.* at 15).

This alleged "fact" is both unsupported and conclusory. First, there is nothing in the record that supports the statement that the Legislature had a "principal policy objective of maintaining the stability of Congressional districts." Second, Defendants imply that they have complied with both state and federal constitutional requirements by moving "the fewest number of citizens from one district by splitting counties." While the number of citizens moved and counties split is relevant to a determination of constitutionality, it is not dispositive. For Defendants to imply otherwise is disingenuous, and not at all "factual."

> 6. Intervening Plaintiff Thornton Cooper submitted three proposed congressional redistricting plans at public hearings held by the Senate's redistricting task force. The Cooper plans, however, did not comport with the policy objections expressed by the Legislature. . . . The three plans submitted by Cooper had small population variances, but were so out of step with the Legislature's objective of preserving existing congressional districts and avoiding contests between incumbents, as well as the state's four-decade tradition of making the smallest changes possible in reapportionment, that no member of the Legislature saw fit to introduce any of Cooper's plans as a bill or as an amendment. (*Id*. at 18).

Here again, Defendants attempt to assert as fact policy objectives that are contained nowhere in the record. Moreover, they attempt to present conclusory

8

statements as fact. There is no support in the record for the claim that there was a specific reason Mr. Cooper's plans were not introduced as a bill or amendment for any specific reason, much less the reason asserted by Defendants.

### B. Lack of Justification

Even aside from the lack of factual support in the record for their conclusory assertions and bald factual statements, the Defendants cannot justify the massive variance. As stated in *Karcher*, "the showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interest, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely." *Karcher*, 462 U.S. at 741, 103 S.Ct. at 2664. In other words, there is a balancing act where the higher the deviation, the more stringent the standard for the deviation. As noted above, in comparison to every other State, West Virginia's deviation is the highest of all, thus of necessity requiring the strongest rationale.

The deviation is extreme. Their justifications are neither specific nor compelling. While it is true that several of the proffered justifications have been acceptable as bases for deviations, none of the proffered justifications are specific, nor do they balance against the extreme deviation sought here.

What the Constitution requires, as pointed out in *Kirkpatrick* and *Karcher*, is that justifications cannot be haphazard, *Karcher*, 462 U.S. at 741, 103 S.Ct. at 2664 (citing

*Kirkpatrick*, 394 U.S. at 534-35). Further, justifications must be thoroughly documented and applied throughout the State in a systematic, not an ad hoc manner. *Id.*

The justifications proffered by Defendants include "maintaining the integrity of counties; complying with compactness; avoiding contests among incumbent Representatives; preserving the core of prior districts; and accomplishing all of these with as little change as possible without regard to partisan politics." Defendants' Joint Brief at 5,6.

As far as maintaining the integrity of counties, this rationalization falls short. In *Karcher*, the U.S. Supreme Court overturned the New Jersey Legislature's variance of 0.6984 by rejecting the justification that maintaining municipal, county, or other political boundaries warrants such a variance. Moreover, it is indeed ironic that the Legislature now claims preservation of county boundaries as a policy or practice in Congressional redistricting where there is no federal or state requirement for such preservation, yet when re-districting state senatorial districts the Legislature has repeatedly cut counties in two notwithstanding an express West Virginia Constitutional prohibition of the practice. *See* Constitution of West Virginia, Article 6, § 4: "The districts shall be compact, formed of contiguous territory, **bounded by county lines**...." Yet Berkeley County has been sliced in two in the last two senatorial redistricting plans – ostensibly to maintain equality in numbers!

As for complying with compactness, the Defendants simply assert that the current plan complies solely because its predecessor plans were not overturned. Each redistricting must stand on its own. Calling the 2nd Congressional District compact

ignores the reality of the district, which stretches from the Ohio River to the Potomac. Simply stating that West Virginia has unique geographical features such as two panhandles does not mean that seeking compactness can be ignored. When the Constitution was drafted, West Virginia contained two panhandles; the drafters were aware of the geography, yet called for compactness nevertheless. West Virginia had three original districts, and a quick glance shows just how compact they were. See Exhibit B, Map of Districts. Jefferson and Putnam Counties were not considered communities of interest, nor were Berkeley and Kanawha, nor were Mineral and Marshall. That does not mean they could not be, but where is the thorough documentation required by *Karcher*? There is none.

Another justification for the extreme variance was to avoid contests among current representatives. This justification is weakened by the fact that representatives need not live in the districts they seek to represent. As there is no constitutional requirement that a congressional representative live in the district she represents – she must live in the state. *See* U.S. Constitution, Art. I, §2(1) and W.Va. Constitution Art. 4, §4.

Another justification put forward by Defendants for having such an extreme variance from the Constitutional requirement of one-person, one-vote is to maintain the core of an already existing district. The "core" of a district is not land area, it is people. In 1992, in the case of *Stone v. Hechler,* the court did not so much agree the district was compact as determine that the lack of compactness was minor in relation to the variance of .09 percent. 782 F.Supp. 1116 (1992). Here the variance is significantly higher than .09%, almost ten times higher.

11

It is telling that in the Defendants' list of the Legislature's priorities in congressional redistricting, equality of population, the first Constitutional priority, was totally absent. See Defendants' Joint Brief, at 5-6. In and of itself, this absence should doom the current plan.

## CONCLUSION

The current congressional redistricting plan is extreme. Defendants' position is that the last couple of redistrictings were pretty close to the current plan, so there is no need to change much. However, two decades ago, the variance was only 0.09%. One decade ago, the variance was only 0.22%. Now, the variance is a whopping 0.79%, and the past rationales and justifications cannot be enough to justify disenfranchising so many people.

                                          JEFFERSON COUNTY COMMISSION
                                          PATRICIA NOLAND and
                                          DALE MANUEL
                                          By Counsel

/s/ Stephen G. Skinner
Stephen G. Skinner (W.Va. Bar # 6725)
Andrew C. Skinner (W. Va. Bar # 9314)
SKINNER LAW FIRM
P. O. Box 487
Charles Town, West Virginia 25414
(304) 725-7029/Fax: (304) 725-4082
sskinner@skinnerfirm.com

/s/David M. Hammer
David M. Hammer (W.Va. Bar # 5047)
HAMMER, FERRETTI & SCHIAVONI
408 West King Street
Martinsburg, WV 25401
(304) 264-8505/Fax: (304) 264-8506
dhammer@hfslawyers.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JEFFERSON COUNTY COMMISSION;
PATRICIA NOLAND, as an individual
and behalf of all others similarly situated;
and DALE MANUEL, as an individual and
behalf of all others similarly situated,

       Plaintiffs, and

THORNTON COOPER,

       Intervening Plaintiff,

v.                                  Civil Action No. 2:11-CV-989
                                      (KING, BAILEY, BERGER)

NATALIE E. TENNANT, in her capacity as
the Secretary of State; EARL RAY TOMBLIN,
in his capacity as the Chief Executive Officer
of the State of West Virginia; JEFFREY
KESSLER, in his capacity as the Acting
President of the Senate of the West Virginia
Legislature; and RICHARD THOMPSON, in
his capacity as the Speaker of the House of
Delegates of the West Virginia Legislature,

       Defendants.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of December, 2011, I electronically filed the foregoing Plaintiffs Jefferson County Commission, Patricia Noland, and Dale Manuel's Brief in Response to Joint Opening Brief of Defendants Jeffrey Kessler and Richard

13

Thompson with the Clerk of the Court using the CM/ECF system which will provide notice to counsel of record as follows:

David M. Hammer, Esquire
Hammer, Ferretti & Schiavoni
408 W. King Street
Martinsburg, WV 25401

Thornton Cooper, Esquire, pro se
3015 Ridgeview Drive
South Charleston, WV 25303

Thomas Rodd, Esquire
West Virginia Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301
Counsel for the Secretary of State and the Governor

George E. Carenbauer, Esquire
Adam B. Tomlinson, Esquire
Steptoe & Johnson PLLC
707 Virginia Street, East, Eighth Floor
P.O. Box 1588
Charleston, WV 25326-1588
Counsel for President Kessler

Anthony Majestro, Esquire
Cynthia Majestro, Esquire
Powell & Majestro, PLLC
405 Capitol Street, Suite P1200
Charleston, WV 25301
Attorneys for Speaker Thompson

                                                                     /s/ Stephen G. Skinner