IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA
At Charleston

JEFFERSON COUNTY COMMISSION, et. al.

    Plaintiffs,

and

THORNTON COOPER,

    Intervening Plaintiff,

v.                                        Civil Action No. 2:11-CV-00989
                                         (Judges King, Bailey, and Berger)

NATALIE TENNANT, *in her capacity as*
*The Secretary of State*, et al.,

    Defendants.

## JOINT RESPONSE OF DEFENDANTS JEFFREY KESSLER AND RICHARD THOMPSON TO THE JEFFERSON COUNTY PLAINTIFFS' OPENING BRIEF AND TO INTERVENING PLAINTIFF THORNTON COOPER'S MOTION FOR SUMMARY JUDGMENT

Defendants Jeffrey Kessler and Richard Thompson respond to Plaintiffs' Opening Brief and Intervening Plaintiff's Motion for Summary Judgment as follows.

### RESPONSE TO JEFFERSON COUNTY PLAINTIFFS' OPENING BRIEF

**I.    The Population Variance in S.B. 1008 is Justified by the Legislature's Legitimate Policy Objectives**

Defendants do not dispute that they must offer evidence of legitimate state objectives to justify the population variance in S.B. 1008.

Plaintiff's brief relies on *Kirkpatrick v. Preisler*, 394 U.S. 526 (1964) and *White v. Weiser*, 412 U.S. 783 (1973) to suggest that various items cannot be considered among the legitimate policy objectives used justify a population variance in congressional redistricting.

According to plaintiff, *White* "specifically rejected an argument that the variances resulted from the Texas Legislature's attempt to avoid fragmenting political subdivisions." (Pl's Opening Br., Doc. 41, at 3)

To the extent *Kirkpatrick* or *White* limited the legitimate state interests that could justify a minor population variance, the interests the Legislature could consider were liberalized in *Karcher v. Daggett*, 462 U.S. 725. Specifically, the Court held:

> Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives. As long as the criteria are nondiscriminatory these are all legitimate objectives that on a proper showing could justify minor population deviations.

*Karcher*, 462 U.S. at 740-41, 103 S.Ct. at 2663-64 (citation omitted)

As Justice White noted in his dissent in *Karcher*, the above quoted language overrules *Kirkpatrick's* limitations on the Legislature's use of certain policy objectives. 462 U.S. at 779-80(White, J. dissenting) ("Yet today the Court -- with no mention of the contrary holdings in *Kirkpatrick* -- opines: Any number of consistently applied legislative policies might justify some variance, including for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives. I, of course, welcome the Court's overruling of these ill-considered holdings of *Kirkpatrick*.")(quotations omitted) Accordingly, *Karcher* sets the standard for which the West Virginia Legislature's policy justifications for the variance in S.B. 1008 should be judged.

Using the proper standard under *Karcher*, the West Virginia Legislature's legitimate state objectives of preserving the core of existing districts, maintaining compactness, preserving

2

communities of interest within districts, respecting county lines, and avoiding contests between incumbents justify the variance in S.B. 1008.[1]

Plaintiff's opening brief makes no mention of this court's opinion in *West Virginia Civil Liberties Union v. Rockefeller*, 336 F.Supp. 395 (S.D. W.Va. 1972), wherein a variance of .78 percent was upheld by the Court as a justified variance. The policy objectives applied by the Legislature in S.B. 1008 are at least as strong now as they were in 1972, given the intervening *Karcher* decision which liberalized the standard for justifying variances and by the fact that the West Virginia Legislature has applied its preference for making the smallest possible change during subsequent reapportionments. (See Kessler/Thompson Opening Br., Document 42, at 2-4) The Supreme Court cited the *Rockefeller* case in *Karcher* with approval and characterized its .78 percent variance as minor. 462 U.S. 725 at 740-41, 103 S.Ct. 2653 at 2663. Plaintiff offers no reason why justifications which led the court to affirm a .78 percent variance would be insufficient to affirm a variance only one one-hundredth of a percent larger.

## II. S.B. 1008 Avoids the Application of Politics Used by Other States in Reapportionment

No party in this case has alleged that the West Virginia Legislature acted in bad faith or with partisan political goals in enacting S.B. 1008 as enrolled. This is important because the use of the consistently applied principles by the Legislature in Congressional redistricting has prevented in West Virginia the types of gerrymandering and partisan battles that can be detrimental to the democratic process.

---

[1] See Chart, Attached as Exhibit A, showing that S.B. 1008 achieves those legitimate objectives more than any other plan.

Jefferson County borders on two states, Maryland and Virginia, and is only a few miles from Pennsylvania. As this is written, partisan bickering in those states is having a deleterious effect on the redistricting process.

In Maryland, a three-judge Federal court is currently considering whether to order a redrawing of Congressional districts because of allegations of political mischief as well as alleged racial discrimination. (*See* "Three-judge panel questions Maryland redistricting", WASHINGTON POST, Dec. 20, 2011, attached as Ex. B.)

In Virginia, partisan quarreling has brought the redistricting process to a halt, such that the state Constitution's deadline for redistricting may be missed. This has led the League of Women Voters to express concern that the conflict "could lead to massive voter confusion as we move into a presidential election year," as well as a lawsuit asking a Federal court to construct its own map in the absence of legislative action. ("League of Women Voters complains about delay in congressional redistricting" WASHINGTON POST, Nov. 22, 2011, attached as Ex. C)

In Pennsylvania, where the Senate, House and Governor are all of the same party, a bill is awaiting the Governor's signature. Unlike the case in West Virginia, where the same three entities are of the same party but followed principles to avoid political disruption of voter intent, Pennsylvania put its computers to work to devise a scheme that a national elections expert has found to be a classic example of gerrymandering. (*See* "In Pennsylvania, the Gerrymander of the Decade?" Real Clear Politics, Dec. 14, 2011 attached as Ex. D)

At the same time these border states have been engaging in partisan wrangling, the West Virginia Legislature acted in good faith despite exceptional temptation by the strong Democratic majorities in both Houses to manipulate the Congressional districts to favor their party.

4

In no place was this temptation greater than with respect to West Virginia's First Congressional District, which had been held by a Democrat since 1969 until Republican David McKinley narrowly defeated Democratic state Senator Michael Oliverio last year. (W. Va. Blue Book, 2008 ed., pgs. 571 -575, attached as Ex. E)

The 1,440 vote difference between Republican McKinley and Democrat Oliverio last year was the second smallest margin in the United States of the 63 races in which a Republican was successful in winning a seat previously held by a Democrat last year. (*See* "Statistics of the Congressional Election of November 2, 2010", Clerk of the House of Representatives (Corrected to June 3, 2011), Washington, DC : 2011, attached as Ex. F). (*See also* "Election Results: Election 2010: House Map", N.Y. TIMES, http://elections.nytimes.com/2010/results/house, attached as Ex. G)

As stated in the original brief, news accounts reported that state Senator Roman Prezioso had offered two amendments in the Redistricting Committee meeting on August 4, 2011 at the request of the Democratic Congressional Campaign Committee ("DCCC") in order to improve the odds of electing a Democrat to Congress, and the amendments were rejected in the Committee. As further evidence of this fact, an affidavit from Senator Prezioso is attached. (Aff. of Sen. Roman Prezioso, attached as Ex. H) The incentive to help Mr. Oliverio in the future could hardly have been greater. As stated earlier, at the time of his candidacy for election to Congress last year, he was a colleague in the Senate of 23 of the current 28 Democratic members of that body. Indeed, he and Senator Prezioso together represented the 13th state Senatorial District for 14 years. (Oliverio Biography, W. Va. Blue Book, 2007 ed. at 355; Prezioso Biography, www.legis.state.wv.us/Senate1/members/senmemview.cfm, attached as Ex. I) More recent news accounts report that the DCCC continues to seek a candidate to run against

5

Representative McKinley, as former state Senator Michael Oliverio last week decided not to try again. The CHARLESTON DAILY MAIL reports that Delegate Tim Manchin recently met with the organization, and that he is seriously considering challenging Representative McKinley. ("Joe Manchin's cousin might run for Congress", CHARLESTON DAILY MAIL, Dec. 21, 2011, attached as Ex. J) Although the heavily Democratic Legislature could have chosen to approve a Congressional redistricting plan to increase the likelihood of a Democrat in the First Congressional District, it did not, and instead passed S.B. 1008 in keeping with its longstanding policy principles. Delegate Manchin, like the great majority of his colleagues in the House of Delegates – both Democrat and Republican – voted for the bill that made no change whatsoever to the First.

### III. S.B. 1008 Meets the West Virginia Constitution's Compactness Requirement

Defendants agree with the Jefferson County plaintiffs that the preferred method to determine compactness is a qualitative assessment, rather than mathematical assessments that were developed long after the state Constitution was adopted in 1872. As they point out, such assessments could not have been what was intended by the drafters who were without the advanced cartographic and computing tools of today, and the words of the Constitution should be given their normal and ordinary meaning. (Pl's Opening Br., Doc. 41 at 8)

But the Jefferson County plaintiffs are entirely wrong in their assertion that there is "scant evidence" that the current Second District is compact. In fact, the evidence is overwhelming. Although Plaintiffs quote the case of *Stone v. Hechler*, 782 F. Supp. 1116 (N.D. W. Va. 1992), for the proposition that compactness under the West Virginia Constitution is "in the eye of the beholder" they fail to recognize that the Court upheld the 1991 Second Congressional District as compact precisely because the Legislature was aware of the state

6

constitutional requirement of compactness and passed a plan that it deemed to be compact. In 2011, legislators approved S.B. 1008 with knowledge that the federal courts had previously upheld the district as compliant with the West Virginia Constitution's compactness requirement.

The only difference between the current Second District and that approved by the Court in *Stone* is that the current Second District is 2 counties and 994 square miles smaller than that found by the Court as compact. Similarly, the only difference between the current Second District and that in S.B. 1008 is that the District is again reduced by a county and another 445 square miles. The net result is that the Second Congressional District as constructed under S.B. 1008 is 3 counties and 1,439 square miles smaller than the District found by the Court in *Stone* to be compact. Even more, in removing Mason County, the Legislature this year has shortened the width of the District, so that its western edge is now in Jackson County rather than Mason. Using the word "compact" in its ordinary meaning, legislators in 2001 who reduced the District by 2 counties, and legislators in 2011 who reduced the District by yet another county, were acting in concert with the intent of the framers.

Further, while ignoring *Stone*'s holding, the Jefferson County plaintiffs cite as evidence of the lack of compactness the fact that the distance between Charles Town and Ripley is greater than the distance between Charles Town and various state capitals. This was exactly the same in the larger Second Congressional District that the Federal court approved as compact in *Stone*.

While geography remains constant, and the distance between Charles Town and Ripley is the same now as it was before the two cities were placed in the same Congressional District in 1991, travel has been greatly improved. Interstate 68, a major East-West Highway that links one part of the District with another, was completed in 1992, at the same time the Second Congressional District was created to include both Charles Town and Ripley. (*See* AA Roads,

Interstate Guide: I-68, http://www.interstate-guide.com/i-068.html, attached as Ex. K) Since that time, progress has been made to bring those cities even closer together. A second major East-West highway, Corridor H, has improved greatly over the past 20 years; has already shortened the travel time between the two major population centers of the District; and is projected to be fully completed within the decade. (See Corridor H History, http://www.corridorh2020.com/History.html, attached as Ex. L)

It is evident that the Jefferson County plaintiffs continue to harbor resentment over the actions of the Legislature in 1991 when it created the basic structure of the Second Congressional District, and in effect are asking this Court to revisit the conclusion of its predecessor in *Stone*, even though the district is smaller under S.B. 1008 than it was in 1991. All of the evidence, however, demonstrates that the district is more compact now than it was then.

### RESPONSE TO THE INTERVENING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendants respectfully request that the Court deny Intervening Plaintiff Thornton Cooper's Motion for Summary Judgment. The Intervening Plaintiff's motion argues, based on his own affidavit, that the West Virginia Legislature could have adopted a congressional redistricting plan that has a smaller population variance than the plan it adopted as S.B. 1008. The Intervening Plaintiff argues only that under step one of *Karcher v. Daggett*, 462 U.S. 725 (1983), there are plans that could reapportion West Virginia's congressional districts in a way that results in a smaller population variance than the plan adopted as S.B. 1008. *Karcher*, however, requires a two step inquiry. The Supreme Court has explained that

> Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives. As long as the criteria are nondiscriminatory these

8

> are all legitimate objectives that on a proper showing could justify minor population deviations.

*Karcher*, 462 U.S. at 740-41, 103 S.Ct. at 2663-64 (citation omitted)

In essence Cooper argues that arguing that the .79% variance is unconstitutional as a matter of law. Cooper cites no authority for the proposition that a variance can be so high that the State is prohibited from justifying it under *Karcher*. Of course, such a result would be inconsistent with *Karcher's* express holding noted above and its implicit holding that numerical cutoffs are not appropriate in this context. *See, e.g., Karcher v. Daggett*, 462 U.S. at 741 ("By necessity, whether deviations are justified requires case-by-case attention to these factors.").

Moreover, even if there is an absolute limit on a variance that can be justified, the variance in this case does not implicate the limit. As noted previously, a number of courts -- including this Court -- have approved variances in the range of this case. *See, e.g., West Virginia Civil Liberties Union v. Rockefeller*, 336 F.Supp. 395, 397 (S.D. W.Va. 1972) (.78% variance); *Skolnick v. State Electoral Bd. of Ill.*, 336 F.Supp. 839, 843 & n.2, 846 (D.C.Ill., 1971) (variance of 0.75%); *Doulin v. White*, 535 F.Supp. 450, 452 (D.C.Ark., 1982) (.78%); *Turner v. State of Ark.*, 784 F.Supp. 585, 589 (E.D.Ark. 1991) (.73% variance). The variance approved in these cases is not considered too large to justify; indeed, the United States Supreme Court used *Rockefeller, supra* as an example of "*small* deviations [that] could be justified" in the second step in the *Karcher* analysis. *Karcher v. Daggett*, 462 U.S. at 741, n.11. It also noted that the .75% variance in *Skolnick, supra* was approved based on respecting "consistent state policies" in spite of the fact that there were plans proposed with lowed variances. *Karcher v. Daggett*, 462 U.S. at 741, n.11.

The Intervening Plaintiff's Motion for Summary Judgment, makes no argument that the West Virginia Legislature's policy justifications: keeping the core of existing congressional districts intact, avoiding contests between incumbent representatives, preserving communities of interests, and respecting the integrity of county lines, are inadequate to justify the slight variance in S.B. 1008. Instead, the Intervening Plaintiff suggests to that Court that the Legislature may not offer justifications for its variance. Intervening Plaintiff's theory is at odds with the Supreme Court's holding in *Karcher*.

The lone case cited by the Intervening Plaintiff for his proposition that the weight of Federal authority no longer permits the Legislature to deviate from zero variance is *Vieth v. Pennsylvania*, 195 F. Supp. 2d 672 (M.D. Pa. 2002). Contrary to the Intervening Plaintiff's suggestion, *Vieth* does not suggest any change in the *Karcher* two-step analysis. Instead, a 2-1 majority in *Vieth* held that Pennsylvania did not adequately justify its variance because its legitimate state objectives were not uniformly applied. The Court found that the adopted plan in Pennsylvania split the most counties and municipalities compared with all plans considered. *Id.* 678. 25 Pennsylvania counties and 59 Pennsylvania municipalities were split by the plan. Pennsylvania's adopted plan in *Vieth* required six incumbents to run against each other, despite the fact that only two congressional seats were lost. *Id.* The adopted plan in *Vieth*, while purportedly justified by the Legislature's desire to avoid splitting voting precincts, actually split more voting precincts than the other plans under consideration. *Id.* Finally, the Court found that to the existent the adopted plan in *Vieth* preserved the core of existing districts, it did so only for Republican incumbents. *Id.* The fact that the Pennsylvania Legislature's policy objectives in *Vieth* were inconsistently applied led the Court to determine that they were pretextual in nature.

Rather than suggesting the legitimate policy objectives can no longer serve to justify minor population variances in redistricting, *Vieth* is properly understood as holding, consistent with *Karcher*, that where there is a variance the Legislature must choose a plan which operates to consistently support the policy objectives it relies on to justify the variance. In sharp contrast to the Pennsylvania plan considered in *Vieth*, the West Virginia Legislature chose a plan that consistently supports its policy objectives. The Legislature chose the plan which best preserves the core of existing districts. S.B. 1008 moves only one county from one district to another. No other plan moved fewer than seven counties. S.B. 1008 did not split a county and did not force any incumbent representatives to run against one another. S.B. 1008 preserves communities of interests within congressional districts and preserves the compactness of congressional districts. These factors were all considered in the Senate Redistricting Committee and on the Senate floor. (See Joint Opening Br., Document 42, at 10-15)

The Intervening Plaintiff offers no argument or evidence that the West Virginia Legislature has failed to adequately justify its deviation from precise numeric equivalence under step two of the *Karcher* analysis. At a minimum, the items produced by these Defendants in support of their opening brief, including the remarks made by Senators both in the Redistricting Committee and on the Senate floor, and the evidence that S.B. 1008 best achieved the Legislature's legitimate policy objectives, raise a genuine issue of material fact with regard to whether there was adequate justification for the population variance. Accordingly, the Intervening Plaintiff's Motion for Summary Judgment should be denied.

## CONCLUSION

In the end, the Plaintiffs and the intervening Plaintiffs want to have this Court substitute their judgment for the judgment of the Legislature. This Court recognizes that to do so would be improper:

> We begin our analysis by observing that there is a strong policy of deference to state legislatures in devising redistricting plans. Redistricting and reapportioning legislative bodies is a legislative task which federal courts should make every effort not to preempt. State policies and state preferences are for a state's elected representatives to decide; federal judges should not interfere unless those policies or preferences directly violate the United States Constitution.

*Deem v. Manchin*, 188 F.Supp.2d 651, 655 (N.D.W.Va. 2002) (citations omitted). This Court recognizes the tradeoffs inherent in redistricting and the fact that the Legislature must be the one to balance those, often conflicting, aims:

> It is obvious that the policy goals of the redistricting plan identified in House Bill 511 will not always be consistent. In some circumstances they will compete. The redistricting exercise is therefore a balancing process in which one objective must sometimes yield to serve another. This is an exercise peculiarly suited to the give and take of the legislative process. Courts, as a consequence, should be reluctant to substitute their judgment for the legislature's choices.

*Id.* The policy choices advanced by the Plaintiffs and the intervening Plaintiff are ones rejected by the Legislature in the balancing process. They participated in the political competition and lost. This Court should be extremely reluctant to substitute the judgment of the Plaintiffs and the intervening Plaintiff under the guise of constitutional decision-making.

| | |
|---|---|
| **JEFFREY KESSLER, in his capacity as President of the West Virginia Senate** | **RICHARD THOMPSON, in his capacity as Speaker of the West Virginia House of Delegates** |
| /s/ George E. Carenbauer | /s/ Anthony J. Majestro |
| George E. Carenbauer (W. Va. Bar No. 634) | Anthony J. Majestro (W. Va. Bar No. 5165) |
| Adam B. Tomlinson (W. Va. Bar No. 11311) | Cynthia A. Majestro (W. Va. Bar No. 5092) |
| STEPTOE & JOHNSON PLLC | Powell & Majestro, PLLC |
| 707 Virginia Street, East, Eighth Floor | 405 Capitol Street, Suite P1200 |
| P.O. Box 1588 | Charleston, WV 25301 |
| Charleston, WV 25326-1588 | (304) 346-2889 – telephone |
| (304) 353-8000 - telephone | (304) 346-2895 – facsimile |
| (304) 353-8180 - facsimile | amajestro@powellmajestro.comj |
| george.carenbauer@steptoe-johnson.com | cmajestro@powellmajestro.com |
| adam.tomlinson@steptoe-johnson.com | Attorneys for Speaker Thompson |
| Attorneys for President Kessler | |

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA
At Charleston

JEFFERSON COUNTY COMMISSION, et. al.
    Plaintiffs,

and

THORNTON COOPER,
    Intervening Plaintiff,

v.                                                 Civil Action No. 2:11-CV-00989
                                                (Judges King, Bailey, and Berger)

NATALIE TENNANT, *in her capacity as*
*The Secretary of State*, et al.,
    Defendants.

## CERTIFICATE OF SERVICE

      I hereby certify that on the 22nd day of December, 2011, I electronically filed the foregoing "**Joint Response of Defendants Jeffrey Kessler and Richard Thompson to the Jefferson County Plaintiffs Opening Brief and to Intervening Plaintiff Thornton Cooper's Motion for Summary Judgment**" with the Clerk of the Court using the CM/ECF system which will provide notice to counsel of record as follows:

David M. Hammer, Esq.
Hammer, Ferretti & Schiavoni
408 W. King Street
Martinsburg, WV 25401
*Counsel for Plaintiffs*

Stephen G. Skinner, Esq.
Skinner Law Firm
P O Box 487
Charles Town, WV 25414
*Counsel for Plaintiffs*

Thornton Cooper, Esq., *pro se*
3015 Ridgeview Drive
South Charleston, WV 25303

Thomas Rodd, Esq
West Virginia Attorney General's Office
812 Quarrier Street, 6th Floor
Charleston, WV 25301
*Counsel for the Secretary of State and
the Governor*

                                               /s/ Adam B. Tomlinson
                                               Adam B. Tomlinson (W. Va. Bar No. 11311)