**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

JEFFERSON    COUNTY    COMMISSION;
PATRICIA NOLAND, as an individual
and  on  behalf  of  all  others
similarly    situated;    and    DALE
MANUEL,   as   an   individual   and   on
behalf   of   all   others   similarly
situated,

       Plaintiffs, and

THORNTON COOPER,

       Intervening Plaintiff,

v.                                  Civil Action No. 2:11-CV-0989

NATALIE    E.    TENNANT,    in    her
capacity   as   the   Secretary   of
State;  EARL RAY TOMBLIN, in his
capacity  as  the  Chief  Executive
Officer   of   the   State   of   West
Virginia;  JEFFREY KESSLER, in his
capacity  as  the  Acting  President
of the Senate of the West Virginia
Legislature; and RICHARD THOMPSON,
in his capacity as the Speaker of
the House of Delegates of the West
Virginia Legislature,

       Defendants.


<u>**MEMORANDUM OPINION AND ORDER**</u>

ROBERT BRUCE KING, United States Circuit Judge, and
  IRENE CORNELIA BERGER, United States District Judge:

    The    Jefferson    County    Commission    and    two    of    its

commissioners,  Patricia  Noland  and  Dale  Manuel,  both  of  whom

reside in Jefferson County, West Virginia, and each proceeding in his or her individual capacity, filed this suit on November 4, 2011, challenging the congressional apportionment enacted by the State of West Virginia following the 2010 census. In their Complaint, the plaintiffs name as defendants Secretary of State Natalie E. Tennant, Governor Earl Ray Tomblin, State Senate President Jeffrey Kessler, and Speaker Richard Thompson of the West Virginia House of Delegates, each in his or her official capacity. Pursuant to 28 U.S.C. § 2284, this three-judge district court was duly appointed by the Chief Judge of the Court of Appeals for the Fourth Circuit to consider the plaintiffs' claims. The trial of the matter took place at The Robert C. Byrd United States Courthouse in Charleston on December 28, 2011, and it is now ripe for decision.

Upon careful consideration of the parties' written submissions and the testimony, evidence, and arguments of counsel, we conclude that West Virginia's congressional apportionment was not accomplished in conformance with the Constitution of the United States. The plaintiffs are therefore entitled to have the enactment declared null and void, and, in turn, to have the Secretary of State permanently enjoined from conducting West Virginia's elections for Congress in accordance therewith.

I.

A.

The 435 voting members of the United States House of Representatives are distributed among the several states in numbers proportionate to each state's percentage of the nation's population, based upon an "actual Enumeration" first conducted in 1790 and repeated "every subsequent Term of ten Years." U.S. CONST. art. I, § 2, cl. 3; see 2 U.S.C. § 2a (requiring that President employ algebraic "method of equal proportions" to calculate and transmit to 82nd Congress within one week of convening on January 3, 1951, and each fifth Congress thereafter, results of most recent decennial census and number of representatives to which each State thereby entitled). Upon such certification by the Executive of the resultant number of representatives, each state establishes its own methodology for apportioning the corresponding districts within its borders.

In West Virginia's case, the state constitution commands that congressional districts "shall be formed of contiguous counties, and be compact. Each district shall contain, as nearly as may be, an equal number of population, to be determined according to the rule prescribed in the constitution of the United States." W. Va. Const. art. I, § 4; see W. Va. Code § 1-2-3 (identifying three current congressional districts, each comprised of contiguous whole counties). The "rule

3

prescribed in the constitution of the United States"
incorporates the requirements of Article I, Section 2, together
with the Fourteenth Amendment, the latter of which, among other
things, prohibits a state from denying "any person within its
jurisdiction the equal protection of the laws." U.S. CONST.
amend. XIV, § 1; see Baker v. Carr, 369 U.S. 186 (1962) (civil
rights action alleging equal protection violations stemming from
legislature's redistricting asserts justiciable Fourteenth
Amendment claim).

In response to the federal government's certification of
the 2010 census and confirmation that West Virginia would remain
entitled to three representatives in Congress, President Kessler
appointed seventeen state senators to a "Redistricting Task
Force" (the "Task Force"), chaired by Senator (and Majority
Leader) John Unger, which conducted a series of twelve public
meetings throughout the state during the spring and early summer
of 2011 to gather citizen input. On August 1, 2011, the West
Virginia Legislature, at the proclamation of Governor Tomblin
three days earlier, convened its First Extraordinary Session to
determine state legislative and federal congressional districts.
Senate Resolution No. 103, adopted at the outset of the special
session, established the Select Committee on Redistricting (the
"Committee"), comprised of the seventeen Task Force senators.

See Joint Opening Brief of Defendants Jeffrey Kessler and Richard Thompson [hereinafter "D. Br."], Exhibit M.

On August 3, 2011, the Committee was presented with an initial proposal providing for a virtually equal division of the State's official 2010 population of 1,852,994. Under that proposal, formally called the "originating bill" but informally dubbed the "Perfect Plan," the First and Second Congressional Districts would each contain 617,665 persons, with the remaining 617,664 to reside in the Third. The Perfect Plan generally observed political boundaries at the county level, although it divided two counties — Kanawha and Harrison — between districts. See Plaintiffs' Exhibit 8.

The following day, August 4, 2011, Committee members proposed alternatives to the Perfect Plan. The Committee ultimately rejected six such alternatives, including two by Senator Roman Prezioso (devised by the Democratic Congressional Campaign Committee, a/k/a the "DCCC"), three by Senator Brooks McCabe (suggested by attorney Thornton Cooper), and one by Senator Douglas Facemire (suggested by non-Committee member Senator Herb Snyder). The Committee reported to the full Senate an eighth proposal, Senate Bill ("S.B.") 1008, propounded by Senator Clark Barnes, which retained the 2001 district boundaries, except for transferring Mason County from the Second District to the Third. On the Senate floor, Senator Snyder

moved to amend the bill with a ninth proposal, but that motion was defeated. The Senate ultimately passed S.B. 1008 over the lone dissent of Senator Unger.[1] The House of Delegates, under the stewardship of Speaker Thompson, approved the bill without debate, and it was signed into law by Governor Tomblin on August 18, 2011.

The resulting apportionment statute, appearing in codified form at West Virginia Code section 1-2-3, provides for 615,991 persons in the First District; 620,862 in the Second; and 616,141 in the Third.[2] The most populous of the three, the

---

[1] The nine alternatives considered by the Legislature were disposed of thusly: (a) the three McCabe (Cooper) Plans were presented to and implicitly rejected by the Committee at the Task Force stage, which adopted the Perfect Plan on August 3, 2011, as the "originating bill"; (b) the two Prezioso (DCCC) Plans were considered and rejected by the Committee on August 4, 2011; (c) on that same date, the Committee also considered and rejected the Facemire (Snyder) Plan; (d) the Snyder Floor Amendment was considered and rejected by the full Senate on August 5, 2011; and (e) the Barnes Plan was considered and approved by the Committee as an amendment to the Perfect Plan on August 4, 2011, and it was then enacted into law as S.B. 1008. Consequently, the Barnes Plan is the plan under challenge in these proceedings.

[2] As provided by section 1-2-3, the counties of Barbour, Brooke, Doddridge, Gilmer, Grant, Hancock, Harrison, Marion, Marshall, Mineral, Monongalia, Ohio, Pleasants, Preston, Ritchie, Taylor, Tucker, Tyler, Wetzel, and Wood constitute the First District. The Second District is comprised of Berkeley, Braxton, Calhoun, Clay, Hampshire, Hardy, Jackson, Jefferson, Kanawha, Lewis, Morgan, Pendleton, Putnam, Randolph, Roane, Upshur, and Wirt Counties. The Third District encompasses the remaining counties, i.e., Boone, Cabell, Fayette, Greenbrier, Lincoln, Logan, Mason, McDowell, Mercer, Mingo, Monroe, (Continued)

Second District, exceeds the mean (617,665) by 3,197 persons
(0.52%), in contrast to a shortfall of 1,674 (0.27%) in the
least populous First District, resulting in a total variance
(a/k/a "Relative Overall Range" or "ROR") of 4,871 (0.79%).  As
illustrated below, the ROR of the enacted apportionment was the
eighth most severe of the nine proposals considered:

| Rank | Proposal | ROR |
|------|----------|-----|
| 1. | Perfect Plan | 0.00% |
| 2. | McCabe (Cooper) Plan 3 | 0.04% |
| 3. | McCabe (Cooper) Plan 2 | 0.06% |
| 4. | McCabe (Cooper) Plan 1 | 0.09% |
| 5. | Snyder Floor Amendment | 0.39% |
| 6. | Facemire (Snyder) Plan | 0.42% |
| 7. | Prezioso (DCCC) Plan 2 | 0.44% |
| 8. | S.B. 1008 (Barnes Plan) | 0.79% |
| 9. | Prezioso (DCCC) Plan 1 | 1.22% |

In accordance with a timetable imposed by statute, see W.
Va. Code § 3-5-7, a candidate for Congress in West Virginia is
required to file a Certificate of Announcement with the
Secretary of State, see id. § 3-1A-6(a).  The Secretary
thereafter transmits to the clerks of the fifty-five county

_____

Nicholas, Pocahontas, Raleigh, Summers, Wayne, Webster, and
Wyoming.

commissions a certification that the candidate is qualified to appear on the ballot. See id. § 3-5-9. The filing period for the upcoming statewide elections is scheduled to begin on January 9, 2012, and to conclude on January 28, 2012. Candidates for Congress are obliged, at the time of filing, to inform the public of the district in which they intend to run. See id. § 3-5-7(d)(2).

B.

The plaintiffs commenced this action in the Northern District of West Virginia on November 4, 2011, against Secretary Tennant, Governor Tomblin, President Kessler, and Speaker Thompson (collectively, the "State" or the "defendants"), seeking a declaratory judgment that West Virginia Code section 1-2-3 fails to comport with the Constitution of the United States (Count One), and that the districts as drawn also contravene the West Virginia constitutional requirements of numerical equivalence and of compactness (Counts Two and Three, respectively). The Complaint requests that the State be permanently enjoined from conducting its congressional elections in conformance with section 1-2-3, and it urges that a more suitable alternative be substituted as the State's official apportionment scheme.

On November 22, 2011, Thornton Cooper moved for leave to intervene as an additional plaintiff, and that motion was

granted on November 30, 2011.   Subsequently, on December 15, 2011, venue was transferred to the Southern District of West Virginia.   Shortly thereafter, on December 17, 2011, Cooper submitted for our consideration a tenth proposal, i.e., Cooper Plan 4.   That proposal divided Taylor County between the First and Third Districts, resulting in a total variance of four persons (0.00% ROR), with 617,663 being placed in the First District; 617,667 in the Second; and 617,664 in the Third.

II.

A.

The Constitutional directive that members of the House of Representatives be chosen "by the People of the Several States," U.S. CONST. art. I, § 2, cl. 1, has been interpreted to "mean[] that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." Wesberry v. Sanders, 376 U.S. 1, 7-8 (1964).   Although "[t]he extent to which equality may practicably be achieved may differ from State to State and from district to district," the Constitution nonetheless "requires that the State make a good-faith effort to achieve precise mathematical equality." Kirkpatrick v. Preisler, 394 U.S. 526, 530-31 (1969) (citing Reynolds v. Sims, 377 U.S. 533, 577 (1964)).   The Kirkpatrick Court emphatically rejected the argument that small, unexplained

9

disparities might be considered de minimis, instructing that "[u]nless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small." Id. at 531.

The Supreme Court has prescribed a procedural mechanism to implement the Sanders practicability standard. At the outset, a party challenging apportionment must demonstrate the existence of a population disparity that "could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal proportion." Karcher v. Daggett, 462 U.S. 725, 730 (1983). Upon such a showing, the burden shifts to the state to prove "that each significant variance between districts was necessary to achieve some legitimate goal." Id. at 731.

The Karcher Court identified several policies or objectives that might support a conclusion of legitimacy. See Karcher, 462 U.S. at 740 ("Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives."). Importantly, the onus is on the proponent of the challenged apportionment — here, the State of West Virginia — to affirmatively demonstrate a plausible connection between the asserted objectives and how they are manifested. As the Karcher Court emphasized, the State

10

must show "that a particular objective required the specific deviations in its plan, rather than simply relying on general assertions." Id. at 741.

B.

At trial last week, the State helpfully conceded that the plaintiffs (hereinafter including the intervening plaintiff) have satisfied their threshold burden under Karcher to demonstrate that the 0.79% variance enacted through S.B. 1008 might have been reduced. See Transcript of Proceedings of December 28, 2011 [hereinafter "Tr."] at 43, 84. Indeed, the State could hardly have argued otherwise, given that no fewer than seven less drastic alternatives were submitted for consideration.[3] The State nonetheless maintains that the enacted variance is solely the result of its efforts to accommodate the legitimate goals of respecting county boundaries, preserving the cores of extant districts, and avoiding a contest in the Republican primary between two of West Virginia's incumbent

---

[3] Cf. Stone v. Hechler, 782 F. Supp. 1116, 1125 (N.D. W. Va. 1992) (per curiam), in which the three-judge panel, applying Karcher, reasoned that "if any plan (other than the one under judicial attack) would reduce or eliminate population differences among the congressional districts, the plaintiff has met its burden." The court continued, "[b]ecause seventeen other plans with a lower overall variance were before the Legislature . . . , the Court concludes that Stone has satisfied his burden." Id. at 1126.

representatives, David McKinley and Shelley Moore Capito. We address each of these contentions in turn.

1.

As initially set forth supra, the Constitution of West Virginia provides for the division of the state into congressional districts, which "shall be formed of contiguous counties, and be compact. Each district shall contain, as nearly as may be, an equal number of population, to be determined according to the rule prescribed in the constitution of the United States." W. Va. Const. art. I, § 4.[4] The integrity of county boundaries has been characterized as a "West Virginia constitutional requirement," Stone v. Hechler, 782 F. Supp. 1116, 1123 (N.D. W. Va. 1992) (per curiam), an observation probably emanating from the quoted excerpt's reference to "counties" and not parts or portions of counties.

The Stone court's comment in passing was not pertinent to the decision in that case, and its accuracy is in any event called into question if the Article 1 excerpt is interpreted within the context of the entire document. In particular, the state constitution's Article 6 provision governing apportionment

---

[4] The compactness and equality requirements of Article I, Section 4 form the basis of the plaintiffs' claims under Counts Two and Three of the Complaint, and they will be briefly discussed infra in Part III.

for the purpose of electing the West Virginia Senate specifies that those districts be "bounded by county lines." W. Va. Const. art. VI, § 4. The absence of a similarly precise reference to "lines" in Article 1 casts doubt on the intended meaning therein of the word "counties," with the result that the provision should reasonably be construed to contemplate that counties may be subdivided, so long as the district's contiguity remains intact.[5]

Upon the Perfect Plan being moved before the Committee, Senator Unger explained the legal basis for the plan's division of counties. See Tr. at 200. Though challenging many members' long-held assumptions to the contrary, the concept of county-splitting was more or less embraced by the Committee as a whole, engendering at least some preliminary discussion of conforming alternatives. See id. at 80-81, 173-74, 200-02.

---

[5] The parties indicated at trial that West Virginia Senate districts no longer observe county lines, owing to the indirect effect of a federal court decision that struck down as violative of the Fourteenth Amendment's Equal Protection Clause the State's apportionment of the House of Delegates. See Goines v. Rockefeller, 338 F. Supp. 1189, 1195 (S.D. W. Va. 1972) ("'When there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls.'" (quoting Reynolds, 377 U.S. at 584)). Though the "county lines" provision is no longer of practical effect, the construct of Article VI, Section 4 is nonetheless useful to discern the drafters' intent as to the slightly dissimilar provisions of Section 4 of Article I.

Whether mandated by the state constitution or not, it is undisputed that, since West Virginia was admitted to the Union nearly 150 years ago, none of its counties have ever been divided between two or more congressional districts.[6]   In accordance with Karcher, then, maintaining the integrity of county boundaries within congressional districts could, in West Virginia's case, qualify as one of those "consistently applied" interests that the Legislature might choose to invoke to justify a population variance.

To that end, Senator Corey Palumbo, Chair of the Senate Judiciary Committee, testified at trial that "it was important to, to a lot of people, whether it was a specific requirement or not, . . . to try to avoid splitting up counties, the county boundaries."   Tr. at 248-49.   Though we give due credit to Senator Palumbo's testimony concerning his general understanding of the decisionmaking process, the Legislature neglected to create a contemporaneous record sufficient to show that S.B. 1008's entire 4,871-person variance — or even a discrete,

_____

[6]   The nation having largely adopted zero-variance congressional apportionment, see infra Part II.C, West Virginia and Iowa are the only remaining states that have never split counties between districts.   See Tr. at 201.   If we assume that the Karcher Court meant its reference to "municipal boundaries" to also include "county lines," the nationwide devaluation of county line integrity may portend the eventual deletion of municipal or county boundaries from the list of potentially legitimate justifications.   See D. Br., Exhibit O, at 24.

numerically precise portion thereof — was attributable to the professed interest in keeping counties intact. As Senator Unger testified without contradiction, there was "nothing in the record as far as the legislation that would give any justification for the act of the Legislature in this regard." Id. at 222.[7]

Moreover, of the eight other proposals under consideration, only the Perfect Plan transgressed county lines, and only Prezioso Plan 1 advocated for a greater variance. Consequently, the Legislature had before it seven alternative proposals that would have operated consistently with its asserted interest in preserving counties inviolate, six of which would have been more in keeping with the constitutional archetype of "one person, one vote." The rejection of more compliant proposals that would have advanced the State's interest at least as effectively as

_____

[7] There was considerable discussion at trial concerning the need for the Legislature to include its findings within the enactment, a practice that is generally "pretty common," Tr. at 222, but one that evidently has never been followed in relation to an apportionment bill, see id. at 255. We think it sufficient that the Legislature's rationale with respect to specific population variances and other relevant considerations, whether denominated "findings" or not, be plainly and accurately documented in the official legislative record. Such could take the form of a Joint Resolution expressing the contemporaneous thinking of the Legislature as a body, which would certainly be preferable to a court attempting to ascertain that thinking via the after-the-fact testimony of individual legislators. But even that minimum requirement was not satisfied here.

the less compliant one actually adopted militates strongly against a conclusion that the Legislature put forth the objectively good-faith effort that Karcher requires.   See Karcher, 462 U.S. at 739-40 (approving district court's conclusion that plaintiffs had satisfied initial burden by demonstrating availability of plans with less extreme population deviations).

2.

Karcher acknowledged that preserving the core of existing districts may afford a legitimate basis for a state to justify a population variance among congressional districts.   The word "core" has been defined as "the central or most important part of something, in particular . . . the part of something that is central to its existence or character."   The New Oxford American Dictionary, 378 (2d ed. 2005).   In the context of congressional apportionment, the core of a district might be most comfortably conceived in geographic terms as being more or less the center portion of a district map.   In West Virginia, however, a state whose irregular shape defies facile description and where most of its largest municipalities lie near its borders, a district's core might as readily be defined by more outlying geographic features, such as the panhandles in the north and the east, or the coalfields in the south.   See Tr. at 230 (Senator Unger's testimony that "we're all connected, but some of us are . . .

16

connected more than others . . . .   I think that the Eastern Panhandle has a very unique situation, as well as the Northern Panhandle, as well as Southern West Virginia").

Beyond the discrete bounds of geography, however, a district's core can also implicate its "[s]ocial, cultural, racial, ethnic, and economic interests common to the population of the area, which are probable subjects of legislation (generally termed 'communities of interest')."   Graham v. Thornburgh, 207 F. Supp. 2d 1280, 1286 (D. Kan. 2002).   The plaintiffs' trial expert, Professor Ken Martis of West Virginia University, explained that "political, geographic, social, economic, [and] cultural variables . . . can be used to look at communities of interest."   Tr. at 114.   Dr. Martis elaborated that communities of interest can be circumscribed, for example, by metropolitan areas, by "vernacular" zones of shared economic initiatives, and even by similarities in geologic features, watersheds, and environmental policy.   See id. at 114-25; Plaintiffs' Exhibits 3-7.

None of these particular concerns factored significantly into the Legislature's decisionmaking, however.   See Tr. at 129, 220.   To the contrary, the emphasis was on preserving the status quo and making only tangential changes to the existing districts.   See id. at 180, 241, 243.   Senator Unger cited the general resistance to change, noting that the delegates from

Mason County were among the few voting against even the minimal tweak that was eventually approved: "[Y]ou always have 'not in my backyard.' . . . [T]hey didn't want to go to the 3rd Congressional District. They didn't want to move." Id. at 202-03. Accordingly, Senator Unger termed S.B. 1008 as "the most politically expedient. It was one that we could do and move out and get out of town, easiest." Id. at 204.

In that sense, the legislative evaluation of district cores in 2011 was reminiscent of the one twenty years earlier in Stone. The court in Stone chose not to attempt its own definition of "core," instead deferring to the Legislature's determination that "preserving district cores means keeping as many of the current congressional districts intact as possible." 782 F. Supp. at 1126. The plaintiff therein did not take fundamental issue with maintaining intactness, but contended that the concept had been misapplied to preserve current districts; he unsuccessfully urged the court to focus instead on safeguarding traditional districts, i.e., to preserve the essential political character "of those counties that have been together in the same district for most of the history of the State." Id.

Regardless of how one perceives the "core" of a congressional district, it must be, by definition, merely part of the whole. A core-Democratic district is bound to have

18

Republican voters; there will be churchgoers who attend Mass though they live in a predominantly Protestant district; shopping malls and sports cars shall, at least in West Virginia, inevitably give way to cornfields and hay wagons.  In a similar fashion, erecting a figurative fence around a district's entire perimeter preserves its geographic core only in the grossest, most ham-handed sense that encasing a nuclear reactor in tons of concrete preserves the radioactive core of that structure.

Indeed, with respect to the current Second District, snaking for the most part in single-county narrowness across the breadth of the state, hundreds of miles southwesterly from the Shenandoah River to the Ohio, identifying its core — geographic or otherwise — would prove virtually impossible.  Kanawha County, the most populated in the state, is in that district together with Berkeley County, which has recently become the second most populous, notwithstanding that the county seats (Charleston and Martinsburg, respectively) are about 300 miles apart by highway.  The anomaly brings to mind the old football adage that when a team decides it has two starting quarterbacks, it more precisely has none.  Taking note of the Second District's excessive elongation, Dr. Martis called it "an abomination."  Tr. at 127.

We certainly understand that, as a general proposition, rearranging a greater number of counties to achieve numerical

19

equality in redistricting means that more citizens will need to accustom themselves to a different congressperson. While we imagine that the acclimatization process may give rise to a modicum of anxiety and inconvenience, avoiding constituent discomfort at the margins is not among those policies recognized in Karcher as capable of legitimizing a variance. That S.B. 1008 was the most effective proposal in maintaining the status quo, see Tr. at 181, is therefore beside the point.

By its dogged insistence that change be minimized for the benefit of the delicate citizenry, we think it likely that the State doth protest too much, at least when we evaluate its position from the perspective of relatively recent history. As demonstrated at trial, the 1991 apportionment effecting the reduction of West Virginia's allocation in Congress from four seats to three, through its introduction of a serpentine Second District, strayed far from the traditional notions of what the state's congressional districts ought to look like. See Tr. at 71, 140; Intervenor's Exhibit 3. More specifically, Dr. Martis testified that beginning with the state's creation in 1863, "if you look at all the districts up until 1991, the Eastern Panhandle has been kept intact." Id. at 140.[8] From our vantage

---

[8] The term "Eastern Panhandle" generally refers to the eight West Virginia counties of the Potomac River watershed, east of the Eastern Continental Divide, i.e., Jefferson, Berkeley, (Continued)

point, what the State now decries as a deviation from the norm could instead be described as a long-postponed reckoning of accounts.[9]

Change is the essence of the apportionment process. Change is required to redress representational inequities that occur over time as people move in or move away, and districts experience significant demographic shifts. By gravitating toward apportionment plans with zero variances, we are as a nation expressing our realization that resistance to change merely for the sake of preserving the status quo is not a virtue to be celebrated and promoted as an end to itself. Conversely, change for the sake of observing the bedrock constitutional principle of "one person, one vote" is an honorable and patriotic endeavor, one that we are confident the Legislature and citizens of West Virginia will see fit to embrace. As Justice Black reminded us in Wesberry v. Sanders:

> It would defeat the principle solemnly embodied in the Great Compromise — equal representation in the House for equal numbers of people — for us to hold that, within the States, legislatures may draw the lines of

_____

Morgan, Mineral, Hampshire, Grant, Hardy, and Pendleton. See Tr. at 143-45.

[9] Asked whether he was "aware that the public particularly in the Eastern Panhandle is not happy with the current congressional plan," Senator Palumbo responded, "I have been made aware of that, yes." Tr. at 257.

> congressional districts in such a way as to give some
> voters a greater voice in choosing a Congressman than
> others.

376 U.S. at 14.

3.

Much was made at trial of the bipartisanship evidenced by the Democratic-dominated Legislature as it strove to avoid placing Republican incumbents McKinley and Capito in the same district.  See Tr. at 183-84 (testimony of Senator Snyder); id. at 243-48, 259 (testimony of Senator Palumbo).  The legislators' laudable intent appears to have been consistent with the latitude afforded by Karcher, but, as with the desire to respect county boundaries, we can point to nothing in the record linking all or a specific part of the variance with the particular interest in avoiding conflict between incumbents.  Moreover, six of the seven more compliant alternatives (excepting the Perfect Plan) would have achieved the same avoidance goal as S.B. 1008, again calling into question the extent to which the Legislature conducted its apportionment in objective good faith.

C.

In defense of the process employed by the State, Senator Palumbo testified that the Committee relied extensively on Stone, which upheld the 1991 apportionment.  See Tr. at 250, 253-54.  In addition, Senator Palumbo's confidence in the constitutionality of S.B. 1008 was buoyed by Karcher itself

22

insofar as Justice Brennan's majority opinion had characterized a prior West Virginia apportionment effort resulting in a nearly identical variance as having court-approved "minor population deviations."  See Karcher, 462 U.S. at 740-41 (citing W. Va. Civil Liberties Union v. Rockefeller, 336 F. Supp. 395, 398-400 (S.D. W. Va. 1972)); Tr. at 256 ("[W]e knew for a fact . . . that a variance of .788 . . . was already found [in Rockefeller] to be a variance that could be justified.").

The Committee was not left to depend on its own legal analysis.  During its second meeting of the special session, on August 4, 2011, the Committee heard from constitutional law expert Robert Bastress, the John W. Fisher II Professor of Law at West Virginia University, concerning the applicable precedents.  At the outset, Professor Bastress carefully explained that "[t]he overriding principle, of course, with congressional redistricting is the requirement that the Legislature make every effort to achieve perfect equality; that is, [] perfect one person, one vote districts."  D. Br., Exhibit O, at 8.  Later on, in response to questioning, Professor Bastress reiterated that, following Karcher,

> [y]ou cannot deviate at all from perfect equality
> unless you've made a good faith effort to avoid any
> deviation and that the Legislature has found that any
> deviation whatsoever is necessary to achieve some
> legitimate interest.  And the [C]ourt has said even a
> de minimis deviation has to be justified.

Id. at 17 (emphasis added); see Tr. at 198 (Senator Unger's testimony that "[t]he two overarching principles that we communicated, at least to the senators, first was the one person, one vote principle out of the U.S. constitution. And the second was the compactness principle.").

There are undeniable parallels between the present dispute and that in the 1991 Stone case, the last time that West Virginia's apportionment was challenged in federal court. Stone, however, does not compel us to a particular result. See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 430 n.10 (1996) (relating proliferation of judges in New York federal district, "each of whom sits alone and renders decisions not binding on the others"). And we have already intimated what we now state clearly: we are unpersuaded by Stone's discussion of preserving the core of congressional districts.[10]

The most obvious and critical difference between the two situations, though, is that the court in Stone approved the State's reapportionment resulting in a 0.09% variance, while the plan before us enacts a variance of 0.79%. The size of a deviation bears on the substantiality of the showing that must

---

[10] Before the Committee, Professor Bastress offered his opinion on Stone that "as the losing lawyer in that case . . . of course I think the decision was wrong." D. Br., Exhibit O, at 12.

be made to justify it.   See Karcher, 462 U.S. at 741.   The Stone court commented that the variance in that case rendered "the State's burden . . . correspondingly light."   782 F. Supp. at 1128.   However inconsequential the burden in Stone, it is necessarily far more cumbersome in a case like this one, when the variance to be justified is almost nine times greater.   Cf. D. Br., Exhibit O, at 23 (setting forth Professor Bastress's opinion that 0.79% is "a fairly significant deviation . . . . It would take more of a justification, significantly more substantial justification, to support a .79 deviation").[11]

     There undoubtedly is some superficial appeal to the argument, based on Karcher's endorsement of the 1972 result in Rockefeller, that a 0.79% variance in West Virginia is every bit as acceptable almost forty years later.   Indeed, Senator Palumbo questioned Professor Bastress in the Committee proceedings as to whether the redistricting requirements had changed since Stone in 1991 had applied the general principles announced eight years before that in Karcher, and Professor Bastress replied that they had not.   See D. Br., Exhibit O, at 12.

     The bedrock legal principles may not have changed, but the precision with which they are applied undoubtedly has.   The

---

     [11] Put another way, the 0.79% deviation (4,871 persons) in this case is about 877% of the 0.09% deviation (556 persons) in Stone.

plaintiffs submitted a list at trial documenting the current apportionment efforts of twenty states following the 2010 census. See Plaintiffs' Exhibit 10. Of the listed states, only West Virginia and Arkansas have approved variances in excess of 0.03%. Fifteen of the states have enacted, or are in the process of enacting, zero-variance proposals like the Perfect Plan. Advances associated with the advent of computer technology have made achieving these sorts of results much easier and much more practicable than when Karcher and Stone were decided. See D. Br., Exhibit O, at 13 (statement of Professor Bastress that "there has been a national trend towards almost perfect equality. That has been enabled by the development of some very sophisticated software").

The Legislature has its own permanent redistricting office, see Tr. at 166, though Senator Snyder testified that, at least until the special session, "few [legislators] had real desire to, to have maps and so forth of the congressional districts done," id. at 167. Using Maptitude® software, the redistricting office can efficiently generate apportionment scenarios, observing any number of parameters such as political boundaries and compactness. See id. at 187, 213-16; Plaintiffs' Exhibit

11.[12]   There is, therefore, no technological barrier to West Virginia conducting its apportionment efforts as precisely as its sister states have.

Moreover, a bit of history helps to place the Karcher Court's approval of the Rockefeller apportionment in the proper perspective.  In the 1950s, West Virginia was divided into six congressional districts having a variance in excess of eight percent.  See Intervenor's Exhibit 1.  The state lost a seat following the 1960 census, and the subsequent apportionment resulted in a variance that, while substantially smaller, yet approached four percent.  See id.

In light of the relatively large disparities confronted by West Virginia immediately prior to the apportionment occasioned by the 1970 census (in which the state's congressional representation was again reduced, to four), it is hardly surprising that the Supreme Court referred to the 0.788% variance in Rockefeller as "minor."  See Tr. at 159 (Cooper's statement that "it's important to understand the context that the Federal Court ruled in 1972 in light of what had been the . . . congressional redistricting population disparities before

---

[12]  Senator Unger testified that legislative staff members had, early on, devised several distinct zero-variance models, and he assured us that similar proposals could be "generated very quickly."  Tr. at 235.

that time"). The times, as Bob Dylan once proclaimed, they are a-changing, and what once was characterized as "minor" may now be considered "major." Put simply, S.B. 1008 was not enacted in conformance with the Constitution. As a result, the plaintiffs are entitled to declaratory and injunctive relief as to Count One of their Complaint.

### III.

The plaintiffs having prevailed on the federal challenge underlying Count One, we need not reach or address the merits of Counts Two and Three, premised on alleged violations of state law. We surmise only that, with respect to Count Two, the state constitutional requirement of practicable equivalence is no more stringent than that of the federal Constitution, in that the former specifically incorporates "the rule prescribed in the constitution of the United States." See W. Va. Const. art. I, § 4. By virtue of the incorporation, it would appear that the protections against disenfranchisement afforded by either is conterminous with the other.

The apportionment that is ultimately emplaced must, of course, comport with the compactness requirement of the Constitution of West Virginia. The ultimate arbiter of that document is the state's Supreme Court of Appeals, which recently rebuffed a number of challenges to the Legislature's

redistricting of the State Senate, including an allegation that the districts were not compact within the meaning of Article I, Section 4. See Order, State ex rel. Cooper v. Tennant, No. 11-1525, slip op. pending (W. Va. Nov. 23, 2011).

At the trial of the case at bar, counsel for the State confronted Dr. Martis with a map of the seventeen senate districts that the Supreme Court of Appeals had just upheld, challenging his opinion that two of those districts (the 6th and the 12th) were not compact, but instead elongated. See Tr. at 133. The point was argued that the state Supreme Court's conclusion as to the senate districts disposed of the plaintiffs' Count Three contention here that the Second Congressional District as enacted in S.B. 1008 was insufficiently compact.

We need not and do not decide that issue today. The State should nonetheless bear in mind, for purposes of devising an alternative to the enactment identified herein as unconstitutional, that a proposal's compactness is best evaluated in holistic terms and not by viewing one or two districts in isolation. See Tr. at 135-36 (testimony of Dr. Martis generally concurring in counsel's suggestion that "you can't just look at one district" and opining that "compact in the State Constitution [means] that all districts as best possible be compact"). In that regard, the inclusion of two or

three elongated districts among seventeen may be considerably more tolerable than one among three.

### IV.

Pursuant to the foregoing, the Court is compelled to declare S.B. 1008, as codified at West Virginia Code section 1-2-3, in contravention of the Constitution of the United States. The enforcement of section 1-2-3 by the defendants is therefore permanently enjoined.[13]

Although we are loath to devise on our own a redistricting plan for the State of West Virginia, the 2012 congressional elections will nevertheless be conducted under an interim plan promulgated by the Court, subject to the following conditions:

(1)   The Court will defer further action with respect to a remedy for the constitutional defect identified herein until January 17, 2012; and

(2)   In the period prior to January 17, 2012, the defendants are encouraged to:

---

[13]   Our good friend Judge Bailey dissents from this declaration and would deny relief to the plaintiffs on all counts.  He thus reserves the right to file a dissenting opinion explaining the reasons in support of his view, to which we reserve the right to respond at a later date.

(a) Seek the enactment of an apportionment plan that satisfies the applicable constitutional mandate; or

(b) Present the Court with one or more alternative plans approved by the defendants for the Court's consideration as an interim plan.[14]

In the absence of successful compliance with one of the foregoing conditions, the Court will, on or after January 17, 2012, be constrained to identify an interim plan for use in the 2012 congressional elections in West Virginia from among those currently in the record of this case, likely either the so-called "Perfect Plan" or Cooper Plan 4.[15]  In any event, any interim plan adopted by the Court may be substituted for and superseded by the Legislature and the Governor, so long as such

_____

[14] Any plans presented by the defendants under paragraph (2)(b) should be explained to the Court, and, if necessary, fully justified.  Further, the plaintiffs should be accorded the opportunity to assess and offer comment to the Court with respect to any such plans.

[15] Senator Unger testified that legislative staffers worked with Professor Martis to conform the Perfect Plan in rough equivalence to the original three congressional districts drawn at West Virginia's creation in 1863, see Tr. at 207, and Dr. Martis confirmed that the Perfect Plan is, in his view, compact under the Constitution of West Virginia, see id. at 149.

substitution complies with the applicable constitutional mandate.

Finally, the Court will retain jurisdiction in this case for such other and further proceedings as may be appropriate, pending further order.

DATED:     January 3, 2012.

ROBERT B. KING
United States Circuit Judge

IRENE C. BERGER
United States District Judge