Chief District Judge BAILEY, dissenting.

**I.**

The majority in this case has applied a standard of review which not only fails to give sufficient deference to the Legislature but also disregards the flexibility of ***Karcher v. Daggett***, 462 U.S. 725 (1983). Accordingly, I am compelled to dissent.

I certainly agree that the plaintiffs have satisfied the first prong of ***Karcher***– showing a variance from exact equality which could be avoided. I disagree that the State has failed to demonstrate a proper justification for the variance. As a result, I would conclude that the State has violated neither Article I, § 2 of the Constitution of the United States nor Article I, § 4 of the Constitution of West Virginia. In reaching the compactness issue, I would conclude that the second congressional district satisfies the compactness requirement contained in Article I, § 4 of the Constitution of West Virginia.

**II.**

In ***Karcher***, the Supreme Court provided the following guidance to a court tasked with determining whether a state legislature has justified a variance:

> Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives. As long as the criteria are non-discriminatory, *see* ***Gomillion v. Lightfoot****,* 364 U.S. 339 (1961), these are all legitimate objectives that on a proper showing could justify minor population deviations. *See, e.g.,* ***West Virginia Civil Liberties Union v. Rockefeller****,* 336 F.Supp. 395, 398-400 (S.D. W.Va. 1972) (approving plan with 0.78% maximum deviation as justified by compactness provision in state constitution); *cf.* ***Reynolds v. Sims****,* 377 U.S. 533, 579 (1964); ***Burns v.***

> ***Richardson**,* 384 U.S. 73, 89, and n. 16 (1966). The State must, however, show with some specificity that a particular objective required the specific deviations in its plan, rather than simply relying on general assertions. The showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely. By necessity, whether deviations are justified requires case-by-case attention to these factors.

462 U.S. at 740-41.

Following this framework, a reviewing court should first identify the legislative policies considered in the process which culminated in the approval of the redistricting plan challenged. Next, a court must determine whether the population deviation in the adopted plan was necessary to achieve the State's objectives, applying this standard flexibly depending upon: (1) the size of the deviation contained in the plan adopted, (2) the importance of the State's interests, (3) the consistency with which the plan adopted reflects those interests, and (4) the availability of alternative plans with lower deviations that substantially vindicate those interests.

**A.**

At the hearing, the defendants established that in adopting the plan before this Court, the legislators were concerned about three primary state interests, namely: (1) keeping counties intact; (2) preserving the cores of existing districts; and (3) avoiding contests between incumbent members of Congress. As outlined below, the legislative record corroborates that these objectives are not *ad hoc* in nature.

**1. Keeping Counties Intact**

On August 3, 2011, the Senate Committee on Redistricting (the "Committee") met to originate a bill reapportioning West Virginia's three congressional districts. At that meeting, Senator Stollings moved the Committee to originate a bill containing the plan that has been called the "Initial Proposal," the "Perfect Plan," or the "Unger Plan." This plan, which I will call the Unger Plan, splits Kanawha and Harrison counties. As a result, the prevailing topic of the meeting was the idea of splitting counties. Apparently in response to or in anticipation of concern over splitting counties, Senator and Committee Chair Unger noted that Arkansas had split counties for the first time after the 2010 census. (See [Doc. 40-1] at 3). Senator Barnes then questioned the exact locations of the splits of Kanawha and Harrison counties. (Id. at 5). Senator Boley inquired whether the Legislature was constitutionally permitted to split counties. (Id. at 7). Senator Hall went so far as to express concern that voting to originate the Unger Plan would indicate that the Committee endorsed dividing county lines. (Id.).

The next day, the Committee heard testimony from Robert M. Bastress, Jr., John W. Fisher II Professor of Law, West Virginia University College of Law ("Professor Bastress"). Senator Unger asked Professor Bastress whether a reviewing court would consider the objective less important because only West Virginia and Iowa maintain the tradition of not splitting counties. (See [Doc. 42-2] at 130-131). Undoubtedly, this question was posed in an effort to persuade other members of the Committee to relent from their position against splitting counties. Finally, in supporting the plan adopted, Senator Hall noted that his opinion keeping counties intact should be a legitimate justification of the variance. (Id. at 159-160).

**2. Preserving the Cores of Existing Districts**

During the August 4, 2011, meeting of the Committee, Senator Palumbo asked Professor Bastress whether West Virginia's congressional districts had been challenged since the State lost its fourth seat. (See [Doc. 42-2] at 117). Professor Bastress indicated that the districts were challenged after the 1990 census but upheld in ***Stone v. Hechler***, 782 F.Supp. 1116 (N.D. W.Va. 1992) based in part upon the State's objective of preserving the cores of previous districts. (Id. at 117-118). Senator Palumbo then confirmed that the law on redistricting had not substantially changed in the intervening 20 years. (Id. at 118-119).

During the same meeting, Senator Foster asked Professor Bastress whether other state legislatures had adopted congressional reapportionment plans that required major shifts in population among districts. (See [Doc. 42-2] at 132-134). This question reflects either that Senator Foster was concerned about adopting a plan that would require substantial shifts in population or that Senator Foster was attempting to persuade other members of the Committee that avoiding those shifts in population was an insufficient justification for adopting a plan with a variance in population. Finally, in proposing the plan adopted, Senator Barnes noted that his plan preserved the cores of the previous districts; Senator Miller agreed. (Id. at 162-163).

**3. Avoiding Incumbency Contests**

Before hearing testimony from Professor Bastress on August 4, 2011, Senator Unger addressed an apparent concern within the Committee of selecting a plan that would create a contest between incumbents. First, Senator Unger noted that the Constitution of the United States does not require a member of the United States House of

Representatives to reside within the district he or she represents. (See [Doc. 42-2] at 113-114). Senator Unger then explained that Congressman Allen West of Florida represents a district in which he does not reside. (Id.).

Upon hearing testimony from Professor Bastress, Senator Unger asked whether incumbency protection was a priority in congressional redistricting. (Id. at 135). Professor Bastress responded that protecting incumbents was a legitimate and valid objective. (Id.). Senator Hall then indicated that he considered asking the same question. (Id.). Finally, Senator Foster asked Professor Bastress how common it was for a representative to reside outside the district he or she represents, stating that he assumed it was rare. (Id. at 136-137). Professor Bastress admitted that it was not common because "it's harder to get elected if you don't live in that district." (Id. at 137).

**B.**

Having identified the interests considered by the State, I will determine whether the population deviation in the adopted plan was necessary to achieve the State's objectives, applying this standard flexibly depending upon the four factors articulated in ***Karcher***.

**1. Size of Deviation**

The variance in this case is a **minor** variance. In ***West Virginia Civil Liberties Union v. Rockefeller****,* 336 F.Supp. 395 (S.D. W.Va. 1972), cited by the ***Karcher*** Court as involving a "minor" variance, the population deviation was 0.7888%. The deviation in the plan under scrutiny in this case is 0.7886%, leading to the inescapable conclusion that the deviation in this plan is also "minor."

Despite this clear guidance, the majority concludes that the deviation at issue is significant. In reaching this conclusion, the majority argues that since ***Karcher***, there has

been (1) an improvement in the redistricting software used by state legislatures and (2) a national trend toward population equality. This Judge finds neither basis proper nor persuasive. The first basis necessarily assumes that the current Court would depart from the ***Karcher*** Court's characterization of a minor variance. However, we lower court judges live in the present and should abstain from offering predictions of how the current configuration of the Court may adjust its previous decisions in light of technological advancements. Instead, I have more properly applied the law as it stands. The second basis completely ignores the ***Karcher*** Court's admonition that these types of challenges should be considered on a case by case basis. *See* ***Karcher***, 462 U.S. at 741.

**2. Importance of State's Interests**

Taken together, there can be no question that the objectives considered by the Legislature are not only legitimate but of great importance. With respect to keeping counties intact, the Court notes that Article I, § 4 of the Constitution of West Virginia requires that congressional districts "shall be formed of contiguous counties . . .." This evidences a state policy of maintaining county boundaries. *See* ***Stone***, 782 F.Supp. at 1123 (recognizing a "West Virginia constitutional requirement that districts be drawn with adherence to county lines"). Furthermore, the State has never before broken county lines in establishing Congressional districts. While ***Karcher*** admittedly speaks in terms of municipal boundaries, ***Reynolds v. Sims***, *supra*, cited by the Court in ***Karcher*** speaks in terms of the boundaries of political subdivisions. In fact, the Court in ***Abrams v. Johnson***, 521 U.S. 74, 99-100 (1997), explicitly recognized that a State's choice not to split counties which represent communities of interest is a legitimate justification under ***Karcher***. As such, the majority's crystal ball moment in which it predicts that the current Court would

likely drop respecting municipal boundaries as a legitimate justification if read to include county lines is inexplicable, though such creative tweaking of ***Karcher*** accurately foreshadows the route the majority travels to reach its unprecedented decision.

Maintaining the cores of existing districts is also a valid consideration in congressional redistricting per ***Karcher***. *See also* ***Turner v. State of Arkansas***, 784 F.Supp. 585, 588-89 (E.D. Ark. 1991) (recognizing causing the fewest changes in the location of counties and people as "two key legitimate legislative objectives" under ***Karcher***). This is more than merely following the status quo. There are valid policy reasons. Keeping the existing districts intact allows the public to know their elected representatives and allows the representative to know his or her district, its problems and needs. In addition, local entities may have been working with their representative on projects to better the district. If that local entity is then shifted to another district, the result may be a loss or delay in the project.

Finally, the avoidance of pitting incumbent representatives against one another is a valid interest per ***Karcher***. The majority affords little deference to this objective, perhaps because the Constitution of the United States does not require a person to reside in the district he or she represents. However, such a view entirely ignores the political reality that voters will rarely elect a person to the United States House of Representatives who does not reside in their congressional district.

**3. Consistency between State's Interests and Plan Adopted**

Turning to the plan which was adopted by the State, sometimes referred to as the "Barnes Amendment," the evidence shows that the State's interests are consistently reflected. No county lines were compromised, it only shifted 1.5% of the population to

another district, and it did not pit any incumbents against each other.

Adding to this consistency, there is no evidence that the State's objectives were pretextual. In fact, this Judge was greatly impressed by the Legislature's efforts to address its redistricting duties in a non-partisan manner. The testimony presented and the results achieved confirm that in choosing the Barnes Amendment, no effort was made to skew election results or to provide any competitive advantage to either party. The West Virginia Legislature is overwhelmingly controlled by the Democratic Party. The members nevertheless chose to ignore that voting power and approve an amendment offered by a Republican.

This bipartisan attitude is also reflected in the final vote tallies on the plan, which passed the State Senate 31-1 and the House of Delegates 90-5. When one considers that these legislative bodies speak for the people of West Virginia, this Court should be hesitant to thwart that will, especially where the State has advanced legitimate reasons for the minor variance from perfect equality.

**4. Adequacy of Available Alternatives**

The evidence shows that none of the other eight plans presented at the hearing would have substantially vindicated the State's interests while adhering more closely to population equality.

None of the plans considered by the Committee or on the Senate floor is an adequate alternative. The Unger Plan has a variance of 0.00%, but splits counties, moves over 34% of the population from one district to another, and pits incumbents against one another. The plan referred to as "Prezioso No. 1," advanced on behalf of the Democratic Congressional Campaign Committee, has a variance of 1.22%, moves 8% of the population

from one district to another, but creates no incumbent contests. The plan called "Prezioso No. 2," also advanced on behalf of the Democratic Congressional Campaign Committee, has a variance of 0.44%, moves 8% of the population from one district to another, but creates no incumbent contests. The Facemire Plan has a variance of 0.42%, moves 38.5% of the population from one district to another, and pits incumbents against one another. The Snyder Floor Amendment has a variance of 0.39%, moves 6.7% of the population from one district to another, and does not pit incumbents against one another.

Likewise, none of the Cooper plans is an adequate alternative. "Cooper No. 1" has a variance of 0.09%, moves 43.8% of the population from one district to another, and pits incumbents against one another. "Cooper No. 2" has a variance of 0.06%, moves approximately 45% of the population from one district to another, and pits incumbents against one another. "Cooper No. 3" has a variance of 0.04%, moves over 40% of the population from one district to another, and does not pit incumbents against one another. Even "Cooper No. 4," which was developed during the course of this litigation and not considered by the Legislature, has a variance of virtually 0.00%, but splits Taylor County, moves one-third of the population from one district to another, and does not pit incumbents against one another.

In comparison, the adopted Barnes Amendment plan has a variance of 0.7886%, moves only 1.5% of the population from one district to another, does not split counties, and does not pit incumbents against one another. As such, a comparison of the adopted plan with the others under consideration clearly shows that the Legislature's exercise of discretion in selecting this plan is beyond reproach. In holding otherwise, the majority has ignored the Court's admonition in ***Abrams*** that "[t]he task of redistricting is best left to state

legislatures, elected by the people and as capable as the courts, if not more so, in balancing the myriad factors and traditions in legitimate districting policies." 521 U.S. at 101. Therefore, I believe that variance in the plan adopted was necessary to achieve the State's objectives, applying this standard flexibly after consideration of the four factors articulated in ***Karcher***. Accordingly, I would conclude that the State has violated neither Article I, § 2 of the Constitution of the United States nor Article I, § 4 of the Constitution of West Virginia.[1]

**III.**

In reaching the compactness issue, this Judge will also not find fault with the compactness of the adopted plan. In ***Stone***, the Court found the second congressional district to be sufficiently compact:

> After reviewing the experts' calculations and considering the floor debate and record evidence, we have come to the view that Plan II follows the West Virginia constitutional dictate that districts be compact. The West Virginia Constitution does not define compactness but imposes upon the State Legislature the obligation to consider it is a principal fact in apportioning congressional districts. The Legislature was aware both of the state constitutional requirement and the effect of compactness in the federal constitutional equation. We think it has been adequately demonstrated that

[1]The majority criticizes the Legislature for failing to consider other possible "perfect equality" plans. While all agreed that other such plans were possible, they also agreed that it was not possible without splitting counties. Given the bona fide interest in maintaining county lines, this Judge cannot fault the Legislature for not examining more deficient plans. Thus, given that the Legislature will have to now split counties to satisfy the demands of the majority of this Court in direct contravention of ***Karcher***, this Judge would suggest that people be moved to the first and third congressional districts from the westerly end of the second district. Such a result would have the effect of satisfying all of the concerns expressed by the Legislature (other than splitting of counties).

each legislative body kept the concept of compactness as a principal goal of its redistricting efforts and did this primarily in pursuit of fulfilling its State constitutional obligations. The fact that there were other Plans that would be deemed more compact than Plan II under the three tests employed by the experts does not detract from the Legislature's effort. In the legislative view, the districts in Plan II were compact as the Legislature viewed that requirement under the West Virginia Constitution, and in weighing that and other legitimate goals it was acting preeminently in a role reserved to a state legislature by the United States Supreme Court.

782 F.Supp. at 1127-28 (internal citations omitted).

This Judge is of the opinion that the Court in ***Stone*** properly deferred to the Legislature's view of the State constitutional requirement of compactness. Applying the same approach here, there can be no question that removing the most westerly end of the district certainly increases the compactness of the district, at least from the layman's view. Accordingly, I would conclude that the second congressional district is compact as required by Article I, § 4 of the Constitution of West Virginia.

For the reasons stated above, I respectfully dissent from the majority's decision.

The Clerk is directed to transmit copies of this Dissenting Opinion to all counsel of record herein.

**DATED**: January 3, 2012.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE